UNITED STATES of America, Appellee,

v.

Joseph J. C. DiCARLO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald C. MacKENZIE, Defendant, Appellant.

Nos. 77–1165 and 77–1166.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1977.

Decided Nov. 11, 1977.

Francis J. DiMento and Earle C. Cooley, Boston, Mass., with whom DiMento & Sullivan, Hale & Dorr, Boston, Mass., David Rosenberg, and Rosenberg, Baker & Fine, Cambridge, Mass., were on brief, for defendant, appellant.

Edward J. Lee, First Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., and Alan D. Rose, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH, Circuit Judge, and CRARY,* District Judge.

ALDRICH, Senior Circuit Judge.

Defendants DiCarlo and MacKenzie, former members of the Massachusetts Senate, appeal from convictions following verdicts of guilty on an indictment charging conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, extortion affecting interstate commerce, (Count I), and the Travel Act, 18 U.S.C. § 1952, use of facilities of interstate commerce in connection with an unlawful activity, (Count II), and six counts charging the substantive offenses. The evidence justified the verdicts. DiCarlo's principal complaint is that the convictions violated his legislative privilege; MacKenzie's is that his conviction depends upon DiCarlo's, a matter we do not reach.

The evidence warranted the following findings. The Commonwealth having undertaken an extensive project to construct a new campus for the University of Massachusetts at Columbia Point in Boston, the New York firm of McKee-Berger-Mansueto, Inc. (MBM) was employed, after public advertising, to be construction manager. In February, 1971, while it was engaged in this activity, a series of newspaper articles, under the by-line of a State House reporter, were published about the contract of a highly critical and, MBM· thought, inaccurate, nature. Before the completion of the four-day series, a legislative order was filed, co-sponsored and signed by DiCarlo and two others, calling for an investigation and report. McKee and MBM's Massachusetts attorney, former Governor Peabody, prepared a rebuttal letter to all three, and personally took one to DiCarlo's home in Revere.

DiCarlo's response was that he was not interested in the merits of the contract, but was very much interested in doing harm to a political rival who, as Commissioner of Administration and Finance, had approved the contract, adding that he should not have had this meeting and would deny having had it. Shocked by this, as well as by DiCarlo's telling McKee that he was naive about political life in Boston, McKee and his associate Mansueto decided that the latter should consult Senator Kelly, an unindicted coconspirator, then Chairman of the Senate Ways and Means Committee, who had once introduced Mansueto to DiCarlo. Mansueto met with Kelly, and the latter volunteered that he could get someone better than Peabody to represent him. Asked how he knew about ·Peabody, Kelly said he knew of the Revere meeting. Peabody had been visible, but McKee was surprised to learn that Kelly knew of a private meeting that DiCarlo had said should not have taken place. Kel-

ly further said that if Mansueto would meet him the following month, when both were going to be in Florida, he might be able to help.

When that second meeting took place, the order was before Kelly's committee. Kelly informed Mansueto that he had talked with DiCarlo; that the latter was out to get his rival, but that he needed money, and that $100,000 to DiCarlo would take care of the matter. Mansueto reported this to McKee, and they decided it was blackmail by DiCarlo, and that they would not go along, even though they now feared the investigation would be "basically phony and unfair." A week later Kelly's committee recommended that the order be adopted. Finding a lack of sufficient proof that Kelly had spoken with DiCarlo's authorization, the court limited the testimony regarding Kelly to McKee's and Mansueto's state of mind.

A legislative committee was appointed to carry out the investigation order, with DiCarlo as its Senate chairman. A public hearing was held, and McKee submitted a brief, but views were expressed at the hearing that were hostile to MBM, and McKee feared that his contract was in danger. He thereupon had an employee, one Harding, meet with defendant MacKenzie. Harding reported that MacKenzie told him that a good committee report would cost $30–$40,-000. By this time McKee was convinced that the contract was in serious trouble, and he and Mansueto decided they must pay. In a series of five payments, $40,000 was paid to MacKenzie, assertedly for DiCarlo.

The payments were made over a period of time. During this interval McKee was shown a copy of the draft report, and found it not satisfactory. He dictated a memorandum, and sent it to MacKenzie, via Harding. When the report was filed, most of McKee's language was in it, under the heading "Conclusions." The entire report was traced to the typewriter used by DiCarlo's secretary, and all other members of the committee denied authorship. There was evidence that the Conclusions section was, though in the opinion of these members correct, out of place in the report if from an outside source without attribution. The purport, and intended effect, of course, of this evidence was to establish a connection, and an illegitimate one, between McKee, MacKenzie, and DiCarlo.

The schedule of payments had not been timely maintained, which resulted in considerable personal friction with MacKenzie. Of greater importance, it was shown, over DiCarlo's objection,[1] that the legislative course of the order, good and bad from the standpoint of MBM, coincided with MBM's performance, or non-performance, of its undertaking, again to show the illegitimate connection. To complete the picture, eleven days after the final payment was made, the report was filed, containing McKee's language and recommending nothing adverse to MBM.

Some weeks later, DiCarlo and MacKenzie arrived, unexpectedly, at McKee's office in New York. DiCarlo lectured McKee severely about the delayed payments telling him he had to share them with others, and said he would like to help MBM in the future, but in that event McKee would have to "play ball," and not get behind.

No purpose would be served by detailing, or characterizing, the defense testimony, except to say that some was unimpressive, and none sufficient to suggest that the verdicts were inadequately supported. DiCarlo's basic defense, accordingly, must be that the objected-to evidence against him, although probative, should have been excluded.

In order to set the stage for the claim of legislative privilege, defendants' brief commences with a statement,

"The charges against DiCarlo were based on his participation in the 1971 Massachusetts legislative committee investigation of a multi-million dollar consultant contract awarded by the state to

---

1. DiCarlo preserved a continuing objection based on legislative privilege. MacKenzie did not.

. . . 'MBM' for overseeing construction . . . at Columbia Point, Boston. Essentially, DiCarlo was tried on the theory that he took certain legislative actions . . . for the corrupt and extortionate purpose of frightening . . MBM" [rather than for a "legitimate legislative purpose."]

We observe, at the outset, that defendants' second sentence would seem to qualify the apparent meaning of the first. But, in any event, the charges against DiCarlo were not "based" on his legislative conduct, but on his conduct outside of the legislature, committing or threatening an offense abusing the legislative function, *cf. United States v. Brewster*, 1972, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507, and using the facilities of interstate commerce. Nor was the case "tried on the theory that he took certain legislative actions." The government's proof, however, was, indeed, aided by reference to legislative acts.

A prima facie case against DiCarlo was sufficiently established by McKee's testimony of the July post-report meeting in New York.[2] However, McKee's credibility, even though reinforced by Harding and another, was attacked, and the government's position was strengthened by the evidence which clearly traced the report's "Conclusions" to McKee's authorship, and by the legislative course which coincided with McKee's varying responses, via MacKenzie, to his claimed undertaking. Essentially, DiCarlo maintains that, as a state legislator, he had an immunity comparable to that conferred upon members of Congress by the "Speech or Debate" clause in the United States Constitution.

▮ The "Speech or Debate" clause does not apply, or purport to apply, to state legislators. *United States v. Craig*, 7 Cir.,

en banc, 1976, 537 F.2d 957, *cert. denied sub nom. Markert v. United States*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796; *In re: Grand Jury Proceedings*, 3 Cir., 1977, 563 F.2d 577.[3] However, it furnishes a place of beginning. The clause reads as follows:

"The Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place." U.S.Const. Art. I, § 6.

Like much other Constitutional language, this has been found to say a great deal in very little, and at the same time its meaning has yet to be fully explored. At the one end of the spectrum, no civil or criminal action will lie for whatever a legislator says on the floor. *United States v. Johnson*, 1966, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681; *Cochran v. Couzens*, 1930, 59 App.D.C. 374, 42 F.2d 783, *cert. denied*, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772. At the other end, although no such case has come to our attention, if a legislator claims he was in Chicago at a certain moment, it should be open to show that he was in the Capitol making an address. Wherever the line may be, it is not, of course, limited to actions on the floor. If this immunity were applicable here, it might be difficult to make any reference to the origin of the report's Conclusion, even for the limited purpose of showing DiCarlo's connection with MacKenzie and McKee. *Cf. Gravel v. United States*, 1972, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583. *See*, in general, *United States v. Brewster*, ante. We are concerned, however, only with the privilege or immunity that attaches to public officials in respect to their official acts.

▮ We mention first a misconception. Defendants seek the "establishment of a legislative privilege under [Federal Evi-

---

2. In light of this evidence, as well as the testimony as to the Revere meeting, neither of which were subject to any legislative privilege, post, were there one, defendants' motion to dismiss was properly denied. The Revere meeting scarcely met the claim in DiCarlo's brief of being a discharge of his "fact-gathering responsibilities," when DiCarlo disclaimed interest in the facts and turned to telling McKee

he would find "what a tough adversary he could be."

3. One member of the en banc court in *Craig* felt that constitutional relationships require the federal courts to respect a state's Speech or Debate clause, and a majority of the Third Circuit panel reached an equivalent result.

dence] Rule 501."[4] To the extent that a privilege exists, it antedated the rule, and was neither created, nor enlarged, by the rule. The effect of a substantive immunity may be to bar evidentiary use of the particular act, but the rule merely applies the immunity, rather than establishes it.

■ The doctrine of official immunity is well recognized, as is the fact that its extent varies, depending upon the office of the individual and the circumstances under which he seeks it. *Barr v. Mateo*, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434. Unquestionably it applies, and is to be applied by the federal courts, to state legislators. *Tenney v. Brandhove*, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019. Unlike the constitutional immunity, the privilege is basically judicially created, as *Barr v. Mateo* points out, and the Court has denied its application to criminal responsibility. *See Imbler v. Pachtman*, 1976, 424 U.S. 409, 428–29, 96 S.Ct. 984, 47 L.Ed.2d 128; *O'Shea v. Littleton*, 1974, 414 U.S. 488, 503, 94 S.Ct. 669, 38 L.Ed.2d 674; *Gravel v. United States*, ante, 408 U.S. at 627, 92 S.Ct. 2614. These cases make inapplicable the approach in *Brandhove*, where the Court in a suit under the Civil Rights Act, found Congress did not intend thereby to impair the privilege. Here, in the face of these cases, we are asked to extend it.[5] Particularly we believe it should not be extended when the crime itself was entirely outside of any legislative act, and the conduct assertedly immunized was introduced for its corroborative evidentiary effect.[6] *Cf. Clark v. United States*, 1933, 289 U.S. 1, 16, 53 S.Ct. 465, 77 L.Ed. 993; *United States v. Manton*, 2 Cir., 1938, 107 F.2d 834 (judge indicted for receipt of bribes did not even question evidence showing his opinions favored bribers).

■ Defendants contend, nevertheless, that concepts of federalism require special protection to state legislators, so not to "lay bare to assault and destruction legislative freedom and independence in its entirety." A similar spectre did not deter the Court in *United States v. Brewster*, ante, 408 U.S., at 521–24, 92 S.Ct. 2531. Moreover, while the Court was there concerned with a constitutional provision designed to preserve an equality, we are here dealing with an asserted common law privilege in an area of federal supremacy. We find nothing to persuade us that the federal-state relationship overrides the government's need of evidence of federal crime. *Cf. United States v. Nixon*, 1974, 418 U.S. 683, 710, 712–13, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

After defendants' brief was filed, the Third Circuit decided *In re: Grand Jury Proceedings*, ante, with a majority opinion containing extensive dicta favoring defendants' position. The court recognized that *O'Shea* "makes clear, [that] official immunity applies only in civil cases," and quoted *Gravel*, that official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress," adding that "separation of powers . . . does not apply when a state legislator is being prosecuted under a federal criminal statute," and that "[w]e perceive no limitation on the grant of powers to require immunization of [state] legislative members of enforcement from federal criminal statutes." Nevertheless, relying on *Tenney v. Brandhove*, although noting it involved only civil immunity, the court concluded that "principles of common law in light of rea-

---

**4.** ". . . the privilege of a witness . . . shall be governed by principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." (1975).

**5.** We consider it to be reading too much into the Court's language in *United States v. Johnson*, ante, 383 U.S., at 180, 86 S.Ct., at 755, that in *Brandhove* the Court "viewed the state legislative privilege as being on a parity with the similar federal privilege," to say it meant that the state privilege is on a full parity with that of Congress. We read *Brandhove* as merely

saying that the state privilege, like the federal privilege, is not destroyed by a claim of malice. If the *Johnson* language meant more than this, it is dictum that stands alone.

**6.** That the case against DiCarlo was not established by the legislative acts was made clear by DiCarlo's counsel informing the jury that the court would instruct it that DiCarlo could not be found guilty unless "you . . . believe that the July 6, 1972 talk took place," and the court's acceptance in its charge.

son and experience dictate the recognition of a federal common law legislative privilege to be applied in federal criminal prosecutions." We join in Judge Gibbons' disagreement. If there is "no limitation on . . . enforcement," we see no basis for creating a limitation that handicaps proof. *United States v. Craig*, ante.

 We turn to defendants' objection to the court's allowing the jury to consider the testimony regarding Kelly's demands, though not evidence that DiCarlo had in fact authorized such speaking in his name, as evidence bearing on McKee's and Mansueto's state of mind, viz., as making them apprehensive, or, as the government put it, softened up for DiCarlo's demand. Although we can understand the court's caution, we think any error was in defendants' favor, viz., in denying the jury the right to tie Kelly and DiCarlo together, if they believed this testimony. If DiCarlo considered that the Revere meeting should not have taken place, and should remain secret, one must wonder what motive would have caused him to disclose it to Kelly. Conversely, although this was not a necessary conclusion, if Kelly was operating on his own, to elect to speak in DiCarlo's name might be expected to lead to complications. The jury might also consider Kelly's position as chairman of the Senate Ways and Means Committee that had to approve the order. In these circumstances it would not seem a far leap for the jury to think of Kelly as a referred-to member of the club when they were considering McKee's testimony that DiCarlo had told him he had been obliged to share the $40,000 with "others." In such event, testimony regarding Kelly's conduct would be admissible against defendants for all purposes.

But even if finding Kelly a co-conspirator should be thought unwarranted, it is not necessary that the fear with which the statute is concerned be caused by the defendant; it is enough that he improperly took advantage of fear induced by others. *United States v. Hathaway*, 1 Cir., 1976, 534 F.2d 386, *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79; *United States v. Crowley*, 7 Cir., 1974, 504 F.2d 992; *United States v. Hyde*, 5 Cir., 1971, 448 F.2d 815,

845, *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745. The court charged the jury that the defendant must know of the fear. The evidence amply warranted such an inference. DiCarlo's lesson on the alleged political facts of life in Boston could be taken as a thinly veiled reference to payoffs, and it could hardly be thought that DiCarlo was the only prospective payee, or that he believed he was the only one who might seek to be such. The jury could well conclude that DiCarlo knew that MBM's vulnerability, as the butt of the newspaper articles and the legislative order, might well cause others to prey upon, and hence increase, McKee's apprehensions.

It is true that the overtones of the Kelly evidence, if DiCarlo's name was unauthorizedly used, could have a prejudicial effect. This was for the district court to weigh. However the matter be viewed, we see no abuse of discretion.

Defendants' other contentions call for no comment. The judgments are affirmed, except to the extent that the district court proposed to modify one as to each defendant if the appeals failed, and for this purpose the case will be remanded.