William COLON BERRIOS, et al.,
Plaintiffs, Appellees,

v.

Miguel HERNANDEZ AGOSTO, et al.,
Defendants, Appellants.

William COLON BERRIOS, et al.,
Plaintiffs, Appellants,

v.

Miguel HERNANDEZ AGOSTO, et al.,
Defendants, Appellees.

William COLON BERRIOS, et al.,
Plaintiffs, Appellees,

v.

Miguel HERNANDEZ AGOSTO, et al.,
Defendants, Appellees.

Pedro Juan Soto, et al., Intervenors,
Appellants.

Nos. 83–1597, 83–1598, 83–1627
and 83–1628.

United States Court of Appeals,
First Circuit.

Argued Aug. 22, 1983.

Decided Sept. 7, 1983.

See also, 662 F.2d 108.

Marcos A. Ramirez, Irizarry, Hato Rey, P.R., with whom Marcos A. Ramirez Lavandero, Ramirez & Ramirez and Jose A. Nazario, Hato Rey, P.R., were on motion for stay pending appeal for defendants, appellants.

Michael Avery, Boston, Mass., with whom Jose Antonio Lugo, Rio Piedras, P.R., Peter Berkowitz, Rio Piedras, P.R., and Rina Biaggi Garcia, Hato Rey, P.R., were on brief, for intervenors, appellants.

Richard L. Cys, Washington, D.C., with whom Maryann Clifford, James F. Hibey, Terrence J. McCartin, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., and Eduardo Castillo-Blanco, Old San Juan, P.R., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

PER CURIAM.

These appeals are taken from an order of the district court enjoining the defendants and their agents: from compelling the plaintiffs to appear and testify publicly at hearings held by the Judiciary Committee of the Senate of the Commonwealth of Puerto Rico; and, from publishing documents in the defendants' possession that are covered by the protective order issued in a separate civil rights action or that are transcripts of testimony before the Committee by the plaintiffs in this case. The order was to remain in effect until the completion of a related civil trial of considerable complexity scheduled to begin in October of 1983.

 While no party has raised the question we note that there exists a jurisdictional problem in this case. After the first two notices of appeal were filed in this case, the intervenors filed in the district court a timely motion for reconsideration under Rule 59(e) F.R.Civ.P. Such a motion renders ineffectual any notice of appeal filed during its pendency and voids any notice filed prior to the filing of the motion. Rule 4(a)(4) F.R.A.P.; *Griggs v. Provident Consumer Discount Co.,* —— U.S. ——, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam).

In this case the record shows that the district judge was not available to decide the motion (in part because he was engaged in other judicial duties elsewhere). In such a case we think it proper, where time is of the essence, to regard the motion as constructively denied. Since one defendant-appellant filed a new notice of appeal 20 days after the motion for reconsideration was filed, we find that our appellate jurisdiction is established. Even were that not the case this would be an appropriate case

for mandamus review and treating the appeals as petitions for a writ of mandamus, the same would be granted.

## I.

The original facts underlying these appeals are fully set forth in our opinion in *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir.1981), but a summary of those facts and a description of the later developments that spawned these cases will be useful to an understanding of the issues presented in these appeals.

In the summer of 1978 two young supporters of a radical pro-independence group died in a shooting incident with police officers at a mountain locale known as Cerro Maravilla. The incident at Cerro Maravilla had and has significant implications and has been the subject of intense media coverage and popular attention.

Three official investigations into the incident have been or are being conducted. Two were conducted by the Commonwealth's Department of Justice, a third was authorized by the Commonwealth Senate and is being conducted by its Judiciary Committee. A suit was also brought under 42 U.S.C. § 1983 by relatives of the deceased against the police officers involved as well as various officials of the Commonwealth (the "Soto" litigation).

The high level of publicity engendered concerns that the civil trial could not be conducted in an unbiased atmosphere. Those concerns, in turn, led to the issuance by the district court of a number of orders, the latest of which are the subject of these appeals.

Of the earlier orders, one is particularly germane to these appeals. The Senate had authorized subpoenas directed to the Department of Justice requiring the production of certain documents gathered by that Department. A second set of those same documents was the subject of a protective order in the Soto litigation. The order restricted the Soto plaintiffs and their counsel from disseminating the documents to outside parties.

While the Department of Justice was not bound by the protective order, it moved the district court to quash the subpoenas. That motion was granted but the order quashing the subpoenas was reversed by this court on appeal. *In re San Juan Star Co., supra,* 662 F.2d at 120. That holding rejected two alternative bases for the district court's action.

We concluded that the protective order provisions of Rule 26(c) F.R.Civ.P. did not apply to non-parties who had obtained the documents from sources independent of the federal litigation.

We also held that the circumstances of that case did not provide a basis for the exercise of an inherent power to ensure a fair trial. In making this second holding we observed that federal courts "might in a proper case be empowered to enjoin a legislature from publishing information to ensure a fair trial . . . ." *Id.* at 119.

As a result of the *San Juan Star* decision, the Senate Judiciary Committee gained access to a quantity of materials which, along with other documents (including the depositions of a number of the defendants in the Soto litigation) and testimony gathered in executive session, formed the basis for televised hearings which began on June 15, 1983. The Senate paid for the televising of the hearings on a commercial station and the hearings were apparently widely viewed.

On June 27, 1983, some of the Soto defendants brought this action against the members of the Senate Judiciary Committee. The action was brought under 42 U.S.C. § 1983 [1] and sought declaratory and injunctive relief substantially the same as that ultimately granted by the district court.

The Soto plaintiffs intervened in this case and along with the Senate Judiciary Com-

---

1. The complaint alleged "jurisdiction" under 28 U.S.C. § 1331 (general federal question jurisdiction); 28 U.S.C. § 2201 (the substantive declaratory judgment provision); 42 U.S.C. § 1983; and 28 U.S.C. § 1651 (the All Writs Act).

mittee defendants appealed from the judgment of the district court.[2]

The defendants below sought a stay of the district court's order. Since these cases involve matters of high importance and since the granting of a stay could effectively terminate these cases, we set the motion for a stay for oral argument and advised the parties that we reserved the option of deciding the appeals on the merits.

After hearing argument on August 25, 1983 we concluded that these cases were ripe for decision on the merits. On August 29, 1983 we granted appellants' motion for a stay of the district court's injunction. We now reverse the judgment of the district court.

## II.

We note at the outset that the district court was faced with a delicate and perplexing situation. The televised hearings and the attendant publicity created significant problems in conducting a civil trial of unusual importance free from undue bias.

The district court apparently viewed some language in our opinion in *In re San Juan Star* as fully defining the circumstances under which a court faced with a fair trial problem could enjoin a legislative body. While we understand the basis for that conclusion, it was incorrect.

In the *San Juan Star* decision we noted that state legislatures might be enjoined "in a proper case" *and* when certain stringent standards had been met. Because we found that the standards applied to prior restraints had not been met, we had no opportunity to discuss what "a proper case" might be. *In re San Juan Star, supra,* 662 F.2d at 119.

■ A plaintiff seeking to prove the existence of a "proper case" for enjoining state legislative activity must overcome the threshold obstacle of legislative immunity. As the district court noted, the Supreme Court has clearly held that state legislators acting in a legislative capacity are absolutely immune from the imposition of equitable remedies in a suit brought under 42 U.S.C. § 1983. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 731–34, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980). That holding would seem necessarily to require the conclusion that this case involved a situation where legislative immunity applied and thus was not a proper case for interference with the legislative power.

Both the district court and the appellees urge a different analysis based on alternative theories.

### A.

■ First, it is urged that while the district court's orders might have been improper under 42 U.S.C. § 1983, it did not act under that provision and thus the immunity found by courts to exist under § 1983 did not apply. The district court is variously described as having acted in a cause of action implied from the Seventh Amendment and the general federal question jurisdictional provision, 28 U.S.C. § 1331; or under the All Writs Act, 28 U.S.C. § 1651.

Under whatever provision the district court might have acted, the question is the same: may one whose cause of action under 42 U.S.C. § 1983 is barred by an accepted judicial interpretation of that act, avoid that bar by recategorizing the claim?

The answer is "No." One case has suggested that where 42 U.S.C. § 1983 was not available because of the Federal nature of the District of Columbia, a derivative con-

---

2. There are actually four appeals. Three of them (83–1597, 83–1598 and 83–1628) are brought by the defendants or intervenors and seek reversal of the judgment as well as certain pre-judgment orders. Those pre-judgment orders (quashing Senate subpoenas and denying a motion to dismiss) will not be separately dealt with since their validity is necessarily intertwined with the validity of the injunctive relief granted in this case. The fourth appeal, 83–1627, is brought by the plaintiffs below and simply seeks to assert as a grounds for upholding the judgment of the district court that an injunction would have been proper under 42 U.S.C. § 1983. As will be discussed, that theory is untenable and appeal No. 83–1627 is dismissed. 1st Cir.R. 12.

stitutional cause of action might be available. *See District of Columbia v. Carter,* 409 U.S. 418, 432–33, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973) (dictum).

We believe that the case is distinguishable because in *Carter* the problem was that, absent a derivative constitutional action, no one could ever obtain access to a federal forum for the redress of injury to federal constitutional rights in the District of Columbia. Thus the problem was complete preclusion, not selective immunity and the *Carter* case is thus more closely akin to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Moreover, the Supreme Court has noted that it has not decided whether an implied right of action under the Constitution can be used to avoid the limitations of an action under 42 U.S.C. § 1983. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). That statement forecloses the argument that the Court did sanction such an approach in *Carter.*

It is true that the Supreme Court has held that a derivative action under the Constitution may be available where there is no statutory cause of action available that is "equally effective." *Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471–1472, 64 L.Ed.2d 15 (1980). But that case also holds that such an action should not be found to exist when there are special circumstances suggesting hesitation in the absence of Congressional action. *Id. See also Bush v. Lucas,* —— U.S. ——, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).

At least one circuit has rejected an argument that a § 1983 action is not equally as effective as a derivative action because of some limitations imposed on the § 1983 action. *Tarpley v. Greene,* 684 F.2d 1, 10–11 n. 24 (D.C.Cir.1982). We need not reach that issue since we find that there are special circumstances here which counsel against recognition of a derivative action broader than a § 1983 action.

The first of these circumstances is the fact that to do so would effectively end the doctrine of common law state legislative immunity. Plaintiffs frustrated by legislative immunity under § 1983 would be free to change their label on their lawsuit and proceed. That would be an inappropriate result. *Cf. Jones v. City of Memphis,* 586 F.2d 622, 625 (6th Cir.1978), *cert. denied,* 440 U.S. 914, 99 S.Ct. 1230, 59 L.Ed.2d 464 (1979) (it would be "incongruous" to hold that a *Bivens* action provided broader basis of relief than a § 1983 action).

The second circumstance is that the doctrine of common law state legislative immunity has been firmly recognized since 1951. *See Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The fact that Congress has not responded to it does not necessarily suggest Congressional approval, but Congressional inaction does suggest that Congress sees no strong need for expanding the existing remedy. In such circumstances we think *Carlson* precludes a judicial creation. *Cf. Kostka v. Hogg,* 560 F.2d 37, 42–3 (1st Cir.1977) (Congressional acquiescence to exclusion of municipalities from § 1983 coverage "critical" to holding that no derivative action was available).

In summary, then, we conclude as follows: that the Supreme Court has not held that a derivative action under the Constitution may be created to avoid the limitations of a § 1983 action when a § 1983 action is available; that to do so in this case would be to abrogate the doctrine of legislative immunity; and that doing so would be imprudent in view of Congressional inaction on the subject.

### B.

■ A second major contention raised to avoid the doctrine of legislative immunity is that the conduct of the legislators went beyond the "sphere of legitimate legislative activity" and thus was not subject to the immunity defense. *See Doe v. McMillan,* 412 U.S. 306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973); *Tenney v. Brandhove, supra,* 341 U.S. at 376–77, 71 S.Ct. at 788–89.

A trio of Supreme Court cases establishes the parameters of this argument.

In *Gravel v. United States,* 408 U.S. 606, 624–27, 92 S.Ct. 2614, 2626–28, 33 L.Ed.2d 583 (1972) the Court held that conduct at legislative hearings was within the legitimate legislative sphere and thus immune. It also held, however, that private publication by a Senator on his own behalf of documents submitted at a hearing was not immune activity.

In *Doe v. McMillan, supra,* 412 U.S. at 313–14, 93 S.Ct. at 2025 the Court held that general public dissemination of an allegedly defamatory report by legislative functionaries is not immune although members of Congress and their staffs were immune from liability for preparing the report or for voting for its publication.

In *Hutchinson v. Proximire,* 443 U.S. 111, 123–33, 99 S.Ct. 2675, 2682–87, 61 L.Ed.2d 411 (1979) the Court held that a single Senator's publication of press releases or news letters was not covered by legislative immunity and distinguished such an instance from a committee hearing or report designed to inform the membership.

It seems clear that the holding of these hearings in public and the gathering of the evidence needed fell within the legitimate sphere of legislative activity. The hearings were properly authorized by Puerto Rico Senate Resolution 91 (Feb. 22, 1981), which provides a specific mandate to the Senate Judiciary Committee to inquire into the activities of the police and other agencies of the government leading up to and during the Cerra Maravilla incident as well as the behavior of the executive branch in response to the incident.

Investigations such as this Senate Judiciary Committee investigation constitute an essential component of the legislative process. *Watkins v. United States,* 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957) (power of Congress to conduct investigations inherent in legislative process). The issuance of a subpoena by the Judiciary Committee to compel witnesses to testify on matters relevant to this authorized investigation is also an indispensable ingredient of lawmaking. *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 505, 95 S.Ct. 1813, 1822, 44 L.Ed.2d 324 (1975). That the investigation is authorized to probe into alleged wrongdoing in the executive branch of government strengthens, rather than weakens, the claim for legislative immunity. *See Watkins v. United States, supra,* 354 U.S. at 187, 77 S.Ct. at 1179. To construe the sphere of legitimate legislative activity in any narrower fashion might permit federal district courts to enjoin state legislative discussion of any matter that was the subject of a pending federal criminal or civil case.

We thus conclude that the conduct enjoined was within the sphere of legitimate legislative activity.[3]

### C.

The third argument presented to avoid the holding in *Supreme Court of Virginia* is that the immunity of the legislators must be balanced against the inherent power of the court to protect the fair trial rights of the parties to a civil action.

**3.** In holding that the district court erred in enjoining the testimony of witnesses in public hearings and the publishing of certain documents, we do not reach the issue of whether the Senate's expenditure of funds for live television broadcast of the hearings falls within the legitimate legislative sphere because, while its holding inevitably precluded any paid television coverage, the district court made no finding as to whether the Senate's paying of television costs was within the legitimate sphere of legislative activity. Such a holding would involve extensive fact-finding and on this record we could not, sua sponte, come to such a conclusion. We thus do not attempt to chart the boundaries of legitimate legislative activities in the field of affirmative dissemination of information. *Cf. Hutchinson v. Proxmire, supra,* 443 U.S. at 123–33, 99 S.Ct. at 2682–87; *Doe v. McMillan, supra,* 412 U.S. at 311–18, 93 S.Ct. at 2024–27; *Gravel v. United States, supra,* 408 U.S. at 622–27, 92 S.Ct. at 2625–28. Such an attempt would require a more complete factual record on this issue than the record before us. We do note, though, that were we to reach this issue and to conclude that the Senate's paying of television costs was not immunized activity, we would then be required to resolve the difficult First Amendment questions posed by prior restraint on such a form of broadcasting.

■ In considering this argument, we initially note Supreme Court cases holding that within the sphere of legitimate legislative activity, the immunity of legislators from suit is absolute. *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. at 732–34, 100 S.Ct. at 1974–75; *Eastland v. United States Servicemen's Fund,* 421 U.S. at 503, 95 S.Ct. at 1821; *cf. Cole v. Gray,* 638 F.2d 804, 810–11 (5th Cir.), *cert. denied,* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). Although *Eastland* involved the immunity of a United States Senator and his staff under the Speech or Debate Clause of the federal Constitution, the Supreme Court stated in *Supreme Court of Virginia* that "we generally have equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution." 446 U.S. at 733, 100 S.Ct. at 1975. The Supreme Court thus did not contemplate that courts would balance common law legislative immunity against competing constitutional claims. Legislative activities otherwise entitled to immunity in a § 1983 suit do not lose the full protection of that immunity merely because plaintiffs allege that such activities violate their constitutional rights.

■ The balancing argument urged by appellees can be divided into two alternative propositions. The first of these is that the district court may enjoin a legislature from fostering defiance of its remedial orders.

This concept is supported by *Bush v. Orleans Parish School Board,* 191 F.Supp. 871 (E.D.La.) (3-judge court), *aff'd sub nom. Denny v. Bush,* 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961) (per curiam).

In *Bush* the district court enjoined the enforcement of certain laws passed by the legislature which were designed to interfere with the court's desegregation orders. In a brief reference the court also enjoined further legislative interference with its judgment. The Supreme Court affirmed in a one sentence order.

*Bush* can be distinguished on at least two bases. First, there is no discussion in either opinion of the question of legislative immu-

nity and *Bush* was decided at a time when no court had squarely held that the immunity applied to equitable actions. Thus it is not clear what legal theory *Bush* stands for.

Second, *Bush* is a post-judgment case. It may well be that the power of a federal court to enforce its judgments is broad enough to reach even legislative collateral interference, although it would seem that the undeniable power of the court to enjoin the enforcement of acts passed by the legislature would normally suffice to protect these interests.

We believe that the *Bush* decision provides no substantive support for the district court's decision. In addition to the distinctions mentioned, we note that the Supreme Court itself has never cited to *Bush* and in the two decades since the decision has examined the question of legislative immunity on numerous occasions. To the extent that *Bush* represents a balancing approach to the clash between a defendant's legislative immunity and a plaintiff's constitutional interests, the Supreme Court decisions in *Eastland* and *Supreme Court of Virginia* at least implicitly overrule *Bush.*

The second proposition is that the district court may act to protect litigants from legislative interference with their fair trial rights. This theory relies on two cases, both of which are readily distinguishable. The two cases in turn derive from the same general incident.

During the pendency of a large and complex series of antitrust cases involving the meat packing industry, a Congressional subcommittee became interested in the pricing practices in that industry.

In support of that investigation the subcommittee subpoenaed documents in the possession of one Hawkins and one Bagley. Hawkins and Bagley were subjected to protective orders in two courts requiring them not to divulge at least some of the subpoenaed documents. Each asked the court for leave to comply with the subpoena.

One request was rejected in *In re Beef Industry Antitrust Litigation,* 457 F.Supp. 210 (N.D.Tex.1978), *appeal dismissed,* 589 F.2d 786 (5th Cir.1979). The district court held that allowing compliance with the sub-

poena would permit undue legislative interference with the court's conduct of the trial. On appeal the court dismissed the case because it found that the subcommittee's entrance into the case was not authorized by the House of Representatives.

The second case is *Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949 (8th Cir.1979). In that case Bagley was granted a limited exemption from the protective order. The Court of Appeals granted a writ of mandamus ordering the district court to reinstate the full coverage of the protective order.[4] The court reasoned that the order had been granted originally for sound reasons and its partial removal was an abuse of discretion and damaging to the claim of one of the parties.

We see no real connection between these cases and the present ones. To say that a court need not or should not allow the legislature a special exemption from its orders is not to say that a court may enjoin a legislature from acting within its sphere.

Moreover, as we noted in *In re San Juan Star, supra,* 662 F.2d at 118–119, the Senate Committee here obtained the relevant documents independent of the Soto litigation in a manner not in contravention of the protective order in the Soto litigation.

In short, we find no implied fair trial exception on the facts of these cases and thus we find no need to balance that exception against the existing legislative immunity, even if such balancing would otherwise be appropriate.

We add that while we share the district court's appropriate concern over the insuring of a fair trial, and recognize the dangers that may inhere in this regard, we remain hopeful that the traditional means of insuring a fair trial will suffice. A continuance of the trial until the publicity engendered by the Senate hearings has dissipated is one possibility to be considered.[5] We also note that impartial juries have

been selected in many highly publicized criminal cases by the use of a rigorous and searching voir dire of the jury venire. And, of course, we expect the jury will be emphatically and clearly instructed to decide the case only on the evidence presented in court. Finally, the district court and this court are not without power to set aside verdicts arrived at in any fundamentally unfair proceeding.

### III.

For the reasons given we hold that the Senate activities enjoined herein were protected by common law legislative immunity and not subject to any known exception to that doctrine.

Accordingly, the orders of the district court are reversed. The mandates shall issue forthwith. No costs.

---

4. On rehearing the Court agreed that, since the documents had already been turned over, the issuance of the writ was improvident. *Id.* at 957.

5. By mentioning this possibility we do not, of course, mean to suggest that the district court must necessarily adopt it. This and other discretionary options depend upon the district court's appraisal of what is best under all the circumstances.