UNITED STATES of America,
Plaintiff,

v.

Velda GONZALEZ DE MODESTI,
Yasmin Mejias Lugo,
Defendants.

Nos. Crim 01–248(SEC),
Crim 01–250(SEC).

United States District Court,
D. Puerto Rico.

June 12, 2001.

**172**

Jorge E. Vega–Pacheco, U.S. Attorney's Office District of P.R., Criminal Division, Hato Rey, PR, for plaintiff.

Rosa N. Bell–Bayron, Rio Piedras, PR, Marco A. Rigau, San Juan, PR, Eliseo Roques–Arroyo, San Juan, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

On April 28, 2001, the Defendants herein were arrested and charged with a violation of 18 U.S.C. § 1382. The Informations allege that:

[o]n or about April 28,2001, in the District of Puerto Rico and within the jurisdiction of this Court, that is, on Camp Garcia Naval Installation at Vieques, Puerto Rico, that is, on the lands reserved for the exclusive jurisdiction of the United States, [the Defendants], did knowingly and unlawfully go upon said Naval installation for any purpose prohibited by law or lawful regulation, that is, 32 CFR Section 770.35 through

1. 01–248: Docket # 17

01–250: Docket # 16

770.40, without first having obtained permission from the Commanding Officer as required by the aforesaid regulations. All in violation of Title 18, United States Code, Section 1382.

(Docket # 1). Pending are Defendants' motions requesting dismissal of the Informations,[1] based on: (1) the Speech or Debate Clause of the Constitution of the Commonwealth of Puerto Rico, and (2) the principle of the consent of the governed underlying the United States Constitution and the relationship between the people of Puerto Rico and the United States. For the reasons set forth below, Defendants' motions are **DENIED.**

### Background

In their motions Defendants submit the following factual summary of this case.

1. On April 28, 2001, the above Defendants, duly elected Senators of the Commonwealth of Puerto Rico, were arrested by United States Naval Officers on Camp Garcia Naval Installation at Vieques, Puerto Rico. At the time of their arrest, Defendants claim that they were complying with official duties and responsibilities, as designated by the President of the Senate of the Commonwealth of Puerto Rico.

2. The source of their designation and authority begins with Section 1 of Concurrent Resolution of the Senate 5 ("Resolution"),[2] which adopts as a public policy of the Legislature of the Commonwealth of Puerto Rico the conclusions and the recommendations of the Commission to Assess the Existing Situation in the Island Municipality of Vieques with Re-

2. The resolution was signed by the Speaker of the House of Representatives and the President of the Senate of the Commonwealth of Puerto Rico on April 10, 2001.

gards to the Activities of the United States Navy ("Commission"), authorized pursuant to Executive Order 1999–21 of May 11, 1999.

3. Section 2 of the Resolution incorporates twenty-six (26) conclusions, recommendations, and strategies set forth by the Commission. One of the Commission's recommendations is a call for the permanent and immediate termination of all military activities in Vieques.

4. Section 3 empowered the President of the Senate of the Commonwealth of Puerto Rico "to engage in efforts as deemed pertinent to further the objectives outlined herein."

5. Section 4 of the Resolution officially notified the President of the United States of America, the United States Congress, the United States Secretary of Defense, the Secretary of the United States Navy and the Governor of the Commonwealth of Puerto Rico.

6. Pursuant to the authority vested by the Resolution, the Speaker of the House and the President of the Senate of the Commonwealth convened a Joint Session of the Committee of the Whole on April 27, 2001 in Vieques, Puerto Rico, and during the session the Defendants were designated as members of a Special Committee to oversee compliance with the newly passed Noise Control Act of 2001.

7. The next day, while conducting legislative duties in accordance with the aforementioned designation the Defendants entered Camp Garcia.

Upon entry, they were detained by United States Naval officials for trespassing on a military installation.

Defendants argue that their detention, arrest, and possible prosecution are a violation of the Speech or Debate Clause of the Constitution of the Commonwealth of Puerto Rico.

**Applicable Law**

The Court will first address the source of Defendants' claim of immunity, which they believe arises from the Speech or Debate Clause of the Constitution of the Commonwealth of Puerto Rico, P.R. CONST. art. III, § 14.[3] The Court agrees with Defendants that the concept of dual sovereignty is implicated in the present matter. Defendants' specific contention is that Section 14 of the Commonwealth's Constitution was not conditioned or rejected by the United States Congress, and therefore, it is a binding part of the political arrangement between the people of Puerto Rico and the United States of America.

The concept of dual sovereignty lies at the heart of the constitutional relationship between the Commonwealth of Puerto Rico and the United States of America. In the case of *United States v. Vega Figueroa,* 984 F.Supp. 71 (D.P.R.1997), this Court examined the constitutional status of the Commonwealth, and specifically held that the concept of dual sovereignty exists in Puerto Rico. In *Vega Figueroa,* a federal defendant had been previously acquitted in the Puerto Rico Superior Court of murder, attempted murder, and various weapons charges arising from the same acts for which he was indicted in federal court. He

---

**3.** That Section states that:

No member of the Legislative Assembly shall be arrested while the house of which he is a member is in session, or during the fifteen days before or after such session, except for treason, felony or breach of the peace. The members of the Legislative Assembly shall not be questioned in any other place for any speech, debate or vote in either house or in any committee.

then moved to dismiss the federal indictment arguing that his prosecution would constitute double jeopardy because Puerto Rico was an unincorporated territory of the United States and therefore, no difference in sovereignty existed between the United States Government and the Commonwealth. *Id.* at 75. In denying Vega Figueroa's request for dismissal, this Court relied on the case of *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A.,* 649 F.2d 36, 39–41 (1st Cir.1981), where Judge—now Justice—Breyer concluded that:

> ... Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And that the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rico Federal Relations Act and the rights of the people of Puerto Rico as United States citizens. As the Supreme Court has written, **the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a state of the union.** *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594[, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976)] ...[4]

In agreeing with the Supreme Court and the First Circuit Court of Appeals, this Court concluded that "[e]ver since [1952], a dual-sovereignty relationship has been established, whereby the Federal Government exercises its sovereignty within its reserved sphere of power, and the Commonwealth government, acting not unlike a state government, exercises its sovereignty within the sphere expressly determined by its own Constitution." *Id.* at 78.

 The question then arises whether in this case the Defendants are situated in the sphere of power reserved for the Federal Government, or the sphere of power reserved to the Commonwealth Government as provided by its own Constitution. The Court believes that based on the well established concept of dual sovereignty between the United States and Puerto Rico, **Puerto Rico is to be afforded the degree of autonomy and independence normally associated with a state of the union.** Moreover, the Federal Government's interest in enforcing its properly enacted criminal statutes mandates that the Court look to Federal law in federal criminal prosecutions. *See United States v. Craig,* 528 F.2d 773 (7th Cir.1976), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796, *concurrence adopted as opinion of en banc court,* 537 F.2d 957 (7th Cir.1976) *cert. denied sub nom. Markert v. United States,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 609 (1976) (holding "... the State Constitution was inapplicable to a state legislator's claim of privilege in a federal criminal prosecution. This was so because the Federal Rules of Evidence and the Federal Rules of Criminal Procedure contemplated that the admissibility of evidence in criminal cases in federal courts would be governed by Federal law and would not be dependent upon diverse state laws, including state constitutional provisions") (*quoted in In re Grand Jury Subpoena,* 626 F.Supp. 1319, 1322 (M.D.Pa. 1986) (internal quotations omitted)); *see also United States v. DiCarlo,* 565 F.2d 802, 806 (1st Cir.1977) (where the First

---

4. It should be noted that the Supreme Court of Puerto Rico has also recognized and held that the dual sovereignty doctrine has applied to Puerto Rico since the adoption of its Constitution in 1952. *See El Pueblo De Puerto Rico v. Castro–Garcia,* 120 D.P.R. 740 (1988).

Circuit held that common law legislative immunity should not be extended when the crime itself was entirely outside any legislative act, and the conduct assertedly immunized was introduced for its corroborative evidentiary effect).[5] Therefore, as we shall explain below, the judicially created concept of official or common law legislative immunity applies to state legislators seeking immunity in federal court.

### Analysis

■ By its very terms the Federal Constitution's Speech or Debate clause is not applicable in cases involving state legislators. *See Lake Country Estates,* 440 U.S. at 404, 99 S.Ct. 1171. However, state legislators have been able to invoke the protection of common law or official immunity in limited circumstances in civil cases. *See Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (holding that a Senate Fact–Finding Committee was acting in a sphere of legitimate legislative activity by calling the plaintiff before it and examining him, and the civil rights statute did not create civil liability for such conduct); *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23 (1st Cir.1996) (holding that absolute immunity from suit for civil damages under § 1983 does not necessarily immunize legislator or his aide from federal criminal prosecution; however, leg-

islator is immunized from suit for damages under § 1983); *Colon Berrios v. Hernandez Agosto,* 716 F.2d 85 (1983) (holding that the conduct of the legislature in holding televised hearings was within the sphere of legitimate legislative immunity and, therefore, was protected by the immunity defense). Therefore, the issue before the Court is whether Defendants can invoke the doctrine of official immunity to dismiss the criminal informations filed against them.

■ "The doctrine of official immunity is well recognized, as is the fact that its extent varies, depending upon the office of the individual and the circumstances under which he seeks it." *Di Carlo,* 565 F.2d at 806 (*citing Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). "Unquestionably it applies, and is to be applied by the federal courts, to state legislators." *Id.* (*citing Tenney* 341 U.S. at 367, 71 S.Ct. 783). Unfortunately for Defendants, unlike constitutional immunity, the Supreme Court has not allowed official immunity to shield a state legislator from a federal criminal prosecution.

In the case of *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), a state senator from Tennessee was indicted on five counts of obtaining money under color of official right in viola-

---

5. Even were we to credit Defendant's assertion that the Commonwealth's Speech or Debate Clause is applicable, the Court notes that both the federal and commonwealth clauses are interpreted in like fashion. In fact, the Supreme Court of Puerto Rico in interpreting the Commonwealth's Speech or Debate Clause, P.R. CONST. art. III, § 14 has stated that "our Legislative Immunity Clause is based on the North American experience and on a similar provision in the United States Constitution, art. I, § 6. Therefore, in cases like the one at bar, it is convenient to study the North American experience." *Silva v. Hernandez Agosto,* 118 P.R.Offic.Trans. 55, 70 (1986). Due to their similarities in both text

and purpose, the Supreme Court of Puerto Rico has consistently looked to the cases construing the United States' Speech or Debate Clause for guidance in its decisions. *See id.; Velez Ramirez v. Coldberg Ramirez,* 116 P.R.Offic.Trans. 1049 (1986) *Pena Clos v. Cartagena,* 114 P.R.Offic.Trans. 744 (1983); *Romero–Barcelo v. Hernandez–Agosto,* 115 P.R.Offic.Trans. (1984). Although Defendants focus their arguments on the second sentence of P.R. CONST. art. III, § 14, we note that the first sentence would also be inapplicable since it only applies in cases of arrest, and does not prohibit the trial, sentencing, or incarceration of the Commonwealth's legislators.

tion of 18 U.S.C. § 1951, and one count of using an interstate facility to distribute a bribe in violation of 18 U.S.C. § 1952. Before trial, Gillock moved to suppress all evidence relating to his legislative activities. The Supreme Court, therefore, was faced with the issue of whether or not the principles underlying the federal constitutional speech or debate privilege compelled a similar evidentiary privilege on behalf of state legislators. *Id.* at 369, 100 S.Ct. 1185.

In deciding the issue, the Court first examined the interrelated rationales that underlie the Speech or Debate Clause: first, "the need to avoid intrusion by the Executive or the Judiciary into the affairs of a coequal branch...." *Id.* (*citing Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 502–503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975)). This rationale, "resting solely on the separation of powers doctrine, gives no support to the grant of a privilege to state legislators in federal criminal prosecutions ... [because] we do not have the struggles for power between the federal and state systems such as inspired the need for the Speech or Debate Clause as a restraint on the Federal Executive to protect federal legislators." *Id.* at 370, 100 S.Ct. 1185. The Court also rejected Gillock's argument that principles of comity should provide the speech or debate type privilege to state legislators. In rejecting this argument, the Court stated that "... federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch." *Id.* (*citing Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

The second rationale in support of a Constitutional Speech or Debate Clause "is the need to insure legislative independence." *Id.* Gillock relied heavily on this

rationale by citing the *Tenney* case where the Supreme Court decided that state legislators were immune from civil suits for alleged violations of civil rights under 42 U.S.C. § 1983. 341 U.S. at 367, 71 S.Ct. 783. In distinguishing the cases, the Court held "first, *Tenney* was a civil action brought by a private plaintiff to vindicate private rights. Moreover, the cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Gillock,* 445 U.S. at 372, 100 S.Ct. 1185. The Court then explained that in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), it had similarly held:

> [w]hatever may be the case with respect to civil liability generally, ... or civil liability for willful corruption, ... we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights.... On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress....' *Gravel v. United States,* 408 U.S. 606, 627, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

*Gillock,* 445 U.S. at 372, 100 S.Ct. 1185.

### Conclusion

■ As is evident from the above analysis, even if the Court were to agree with Defendants' dubious argument, and agree that their actions were legislative in nature, their requests for legislative or official immunity are unsuccessful. The Court concludes, therefore, as did the *Gillock* Court, "that although principles of comity command careful consideration, [the] cases disclose that where important federal interests are at stake, as in the

enforcement of federal criminal statutes, comity yields." *Id.* at 373, 100 S.Ct. 1185; *cf. Di Carlo* 565 F.2d at 806. Therefore, Defendants' motions to dismiss the Informations are **DENIED.**

SO ORDERED.