**UNITED STATES of America,**
**Appellee,**

v.

**Melquiades DE JESUS, Appellant.**

**No. 222, Docket 26590.**

United States Court of Appeals
Second Circuit.

Argued Jan. 6, 1961.

Decided April 13, 1961.

Arthur I. Rosett, Asst. U. S. Atty. Southern District of New York, New York City (S. Hazard Gillespie, Jr., U.

S. Atty., and Herbert B. Greene and Gideon Cashman, Asst. U. S. Attys., New York City, on the brief), for appellee.

Charles Bricker, New York City, for appellant.

Before MAGRUDER, WATERMAN and FRIENDLY, Circuit Judges.

MAGRUDER, Circuit Judge.

Appellant De Jesus was indicted in a nine-count indictment framed under 18 U.S.C. § 1301, which reads as follows:

"Whoever brings into the United States for the purpose of disposing of the same, or knowingly deposits with any express company or other common carrier for carriage, or carries in interstate or foreign commerce any paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any advertisement of, or list of the prizes drawn or awarded by means of, any such lottery, gift enterprise, or similar scheme; or knowingly takes or receives any such paper, certificate, instrument, advertisement, or list so brought, deposited, or transported, shall be fined not more than $1,000 or imprisoned not more than two years, or both."

Count 1 charged the defendant with having entered a conspiracy to commit an offense against the United States under 18 U.S.C. § 1301. Count 2 charged that the defendant in or about the first three weeks of December, 1959, did knowingly and willfully cause to be carried in interstate commerce from Puerto Rico to New York City, New York, certain lottery tickets. Count 3 charged that the defendant in or about the third week of December, 1959, did knowingly and willfully receive said lottery tickets knowing that they had been unlawfully carried in interstate commerce. Count 4 charged that the defendant in or about the last two weeks of December, 1959, knowingly and willfully did cause to be carried in interstate commerce from Puerto Rico to New York City certain lottery tickets. Count 5 charged that the defendant did knowingly and willfully receive the said lottery tickets knowing that they had been unlawfully carried in interstate commerce. Count 6 charged that the defendant in or about the last two weeks of December, 1959, did knowingly and willfully cause to be carried in interstate commerce from Puerto Rico to New York City "a number of lists of the prizes drawn and awarded by means of a lottery." Count 7 charged that the defendant did knowingly and willfully receive the aforesaid lists of prizes, knowing that they had been transported unlawfully in interstate commerce. Count 8 charged that the defendant on or about January 3, 1960, knowingly and willfully did cause to be carried in interstate commerce from New York City to Puerto Rico certain lottery tickets. Count 9 charged that on or about January 7, 1960, the defendant knowingly and willfully did cause to be carried in interstate commerce certain lottery tickets.

█ Defendant pleaded not guilty, and the case was tried by the district court without a jury. The district court found that the defendant was guilty on each of the nine counts in the indictment. On count 1, charging a conspiracy, the court imposed a sentence of one year and one day but suspended the execution of this sentence and placed the defendant on probation for a period of five years. On the remaining eight counts, charging the various substantive offenses, the defendant was fined the sum of $250 on each count, for a total fine of $2,000.

On this appeal from the judgment of conviction, defendant urges the insufficiency of the evidence to warrant a conviction. Defendant also claims that transportation between Puerto Rico and New York is not "interstate" commerce, as defined in 18 U.S.C. § 10.

The government's case against the defendant, who did not testify in his own behalf, rested on the testimony of one Rodriguez, substantiated in part by that of various government agents. Rodriguez testified that while in a bar during a visit from Puerto Rico to New York City, he overheard a conversation about selling tickets for the weekly lottery held in Puerto Rico. He asked one of the persons engaged in the conversation, Figueroa, if he purchased such tickets. Figueroa said that he did not but he gave Rodriguez the unlisted telephone number of the defendant. Rodriguez then called the given number, spoke with the defendant, and a meeting was arranged. Rodriguez and De Jesus met, and in the course of the conversation De Jesus said that he would be interested in purchasing 400 lottery tickets for delivery in New York City. Rodriguez explained to the defendant that he would personally deliver the tickets, and the two men agreed upon a price of $16.50 per ticket. Rodriguez also stated that after the drawing he would deliver to De Jesus the lists of the winning tickets.

This transaction was accomplished as contemplated: Rodriguez went to Puerto Rico, purchased 400 tickets for the drawing to be held December 27, 1959; put them in a box, and on December 16, 1959, air-shipped them to New York City, naming himself as consignee. Rodriguez then flew to New York, where he picked up the tickets at the airport and delivered them to De Jesus at the latter's house. After inspecting the box, which still bore the shipping labels, De Jesus paid Rodriguez $6,000, and ordered 400 tickets for another drawing. This second transaction was executed in the same manner as the first, with the addition that Rodriguez also shipped to New York 35 lists of the winning lottery tickets in the first drawing. For this second delivery Rodriguez was paid by De Jesus by handing to him certain winning lottery tickets which were worth $6,145, plus $455 in cash.

Again De Jesus ordered more tickets, and Rodriguez returned to Puerto Rico, where he cashed in the winning tickets that had been given him and bought the additional 600 tickets for the third drawing, as requested. Evidently the scheme had been discovered, however, for while the two boxes containing the 600 tickets were at the airport in San Juan they were opened by government agents, all the tickets but one were withdrawn, and the boxes were resealed and sent on their way. Upon their arrival in New York another agent observed their delivery to Rodriguez' mother. The agent opened the boxes and found the lottery ticket; when Rodriguez arrived he was arrested. Subsequently De Jesus' apartment was searched, and various lottery tickets and lists of winning numbers were found there.

The only testimony contrary to that of Rodriguez came from Figueroa, who denied that he had given the defendant's telephone number to Rodriguez in a bar, and who related a conversation between Rodriguez and the defendant in which the latter had said he would not purchase any lottery tickets. The district court apparently disbelieved the witness Figueroa, as he was free to do, and gave credence to the testimony of Rodriguez, which was amply supported by that of the government agents and by the introduction of the bills of lading for the three shipments, as well as the various lottery tickets and lists found in the defendant's apartment.

It can hardly be denied that there was sufficient evidence to support the conviction on counts 3, 5 and 7. The testimony of Rodriguez that De Jesus had received the tickets and the lists of winning tickets was substantiated by the search of De Jesus' apartment conducted by the government agent. United States v. Wade et al., D.C.S.D.Tex.1932, 59 F.2d 831, and United States v. McGuire, 2 Cir., 1933, 64 F.2d 485, 491, much relied upon by appellant, are inapposite. In Wade the acquitted defendants had no connection with the tickets before their journey

in interstate commerce had terminated. In McGuire, a count of the indictment charged that the tickets had "theretofore been transported" in interstate commerce. The count being demurred to on the ground that no federal crime had been alleged, the demurrer was sustained, and as to that count only the defendants were discharged.

■ The evidence to sustain the conviction of De Jesus for conspiracy, as charged in count 1, seems no less convincing: An agreement which entailed a prohibited interstate shipment was made and the necessary overt acts were carried out.

■ Conviction on the remaining five counts in the indictment must rest upon the application of § 2 of Title 18, which provides that:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

Under our decision in United States v. Peoni, 2 Cir., 1938, 100 F.2d 401, 402, it is enough that De Jesus "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." See also Nye & Nissen v. United States, 1949, 336 U.S. 613, 619–620, 69 S.Ct. 766, 93 L.Ed. 919; Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435. The undertaking by De Jesus in advance of the shipments of the tickets to purchase the tickets once they had arrived is sufficient to support his conviction as an aider and abetter of all the criminal conduct that Rodriguez did.

So far as the substantive offense in count 8 is concerned, which charged the defendant with having caused to be carried in interstate commerce from New York City to Puerto Rico certain winning lottery tickets, it was obviously essential to the plan that these tickets should be returned to Puerto Rico for collection.

■ 18 U.S.C. § 10 defines the term "interstate commerce," as used in this title, as including "commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia." Defendant here relies upon the oft-repeated shibboleth that criminal statutes "must be strictly construed," and he asks us therefore to hold that Puerto Rico, which became a commonwealth in 1952, has ceased to be a "territory" or a "possession" and hence is not within the statutory definition. This argument must be rejected, upon the authority of Moreno Rios v. United States, 1 Cir., 1958, 256 F.2d 68, 71. See also Detres v. Lions Bldg. Corp., 7 Cir., 1956, 234 F.2d 596.

We do not doubt that, at the time of its original enactment on March 4, 1909, 35 Stat. 1136, and in 1948, when the Criminal Code was enacted into law, Congress intended the act to apply to Puerto Rico, which had not at that time received commonwealth status. In view of the important provision of the so-called "compact" to the effect that "[t]he statutory laws of the United States not locally inapplicable * * * shall have the same force and effect in Puerto Rico as in the United States," 48 U.S.C.A. § 734, it was not necessary for the Congress to alter specifically all outstanding statutes theretofore previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth in 1952. See Moreno Rios v. United States, supra, 256 F.2d 68, 72.

The judgment of the District Court is affirmed.