James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

UNION de EMPLEADOS de los SUPER-MERCADOS PUEBLOS, Defendant.

Civ. No. 58-73.

United States District Court, D. Puerto Rico.

Jan. 30, 1974.

Asst. U. S. Atty., Ignacio Rivera, San Juan, P. R., for plaintiff.

Federico A. Cordero, Santurce, P. R., for defendant.

OPINION AND ORDER

CANCIO, Chief Judge.

This is an action brought by the Secretary of Labor of the United States under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, et seq., 29 U.S.C. § 401, et

seq. (hereinafter the Act), to compel a local labor organization to comply with Section 401(b), 29 U.S.C. Section 481(b), which requires such labor organization to "elect its officers not less often than once every three years by secret ballot among the members in good standing." Jurisdiction is premised on Section 402(b) of the Act, 29 U.S.C. Section 482(b), which requires the Secretary, upon a complaint filed with him by a member in good standing of the labor organization urging the compliance with Section 401(b) of the Act, to investigate said complaint and "if he finds probable cause to believe a violation . . . has occurred and has not been remedied, he shall within sixty days after the filing of said complaint, bring a civil action against the labor organization as an entity in the District Court of the United States in which such labor organization maintains its principal office . . . to direct the conduct of an election . . . under the supervision of the Secretary . . . ."

It is alleged in the complaint that defendant, Unión de Empleados de los Supermercados Pueblo (hereinafter "Unión"), is and at all times relevant has been a local labor organization engaged in an industry affecting commerce within the meaning of Section 3(i), 3(j) and 401(b) of the Act, 29 U.S.C. §§ 402(i), 402(j), and 481(b); [1] that by letter of August 1, 1972, Filomeno Vargas Flores, a member in good standing of defendant Unión, acting in accordance with its constitution and bylaws, protested the failure of defendant to conduct an election of officers of defendant's Executive Board; that having failed to receive a final decision within three calendar months, Mr. Flores, on November 21, 1972, filed a complaint with the Secretary in accordance with Section 402(a) of the Act, 29 U.S.C. § 482(a),[2] alleging violations of 401 of the Act, 29 U.S.C. § 481; that after investigation of the complaint, plaintiff found probable cause to believe there was a vi-

[1] These sections provide in pertinent part as follows:
" . . . . .
402(i) 'Labor organization' means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in part or in whole, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.
402(j) A labor organization shall be deemed to be engaged in an industry affecting commerce if it—
(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended; or
(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or
(3) has chartered a local labor organization or subsidiary body which is representing

or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or . . . ."
"481(b) Every national or international labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing."

[2] Said section provides as follows:
"(a) A member of a labor organization—
(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

olation of Section 401(b) of the Act, 29 U.S.C. § 481(b), as aforementioned, and that it had not been remedied at the time of the institution of this suit. The following violations are alleged to have occurred: (1) failure of defendant to elect its officers not less often than once every three years by secret ballot among its members in good standing, in violation of Section 401(b) of the Act, and (2) failure of defendant to conduct an election as provided by its constitution and by-laws in violation of Section 401(e) of the Act. In its prayer, plaintiff requests for (1) judgment directing defendant to conduct nominations and an election of all officers, under supervision of plaintiff (2) the costs of this action, and (3) any other relief that may be appropriate.

Defendant Unión has moved to dismiss the complaint because this Court lacks jurisdiction over the subject matter therein contained.—Federal Rules of Civil Procedure, 12(b)(1).

In his motion defendant alleges that the Act here in question is not applicable to the Commonwealth of Puerto Rico and that Congress, in including Puerto Rico within the definition of the word "state" in Section 3(b) of the Act, 29 U.S.C. § 402(b),[3] acted *ultra vires* and in contravention to the fundamental principle of government by consent as enshrined in Public Law 600, approved "in the nature of a compact" and authorizing the people of Puerto Rico to adopt a Constitution, 64 Stat. 319, 48 U.S.C. § 731b, and the Federal Relations Act incorporated therein as Section 4, 48 U.S.C. Sections 734–873.

At the outset, we point out that this case is one in which, due to the issue it presents, we would have preferred to write not only a well-thought and deeply-meditated opinion, but also a comprehensive one in which every aspect of the Court's thinking be written down to the utmost. The pressure of time which the resignation of the undersigned as judge of this court has brought with it, however, does not allow for writing down in all detail all the desired reasoning. No matter how well the Court has thought of the issues here present and how deeply it has meditated on their merits, this time it must yield to time limitations and, at the risk of oversimplifying complex legal matters, there is no other alternative but to dispose of the matter before it through a relatively brief memorandum and order.

A short historico-juridical background is necessary in order to place the factual and legal questions before the Court in the proper perspective for a judicial decision.

■ Since the very beginning of the acquisition of Puerto Rico by the United States in 1898, when the Spanish regime over the island gave way to the American regime, and up to July 25, 1952, Puerto Rico was a Territory or a colony governed by the United States under a system of delegated powers to local authorities. Both during the two years of military government of the island and during the life of its two organic acts [4] approved by Congress to provide for its internal government, there was no doubt that Puerto Rico was governed by the United States under the authority granted to it by Article IV of the Constitution.[5] Between 1950, and 1952 upon the approval of a congressional enactment [6] "in the nature of a compact" with the people of Puerto Rico and its subsequent approval and acceptance

---

3. (b) "State" includes any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act.

4. Act of April 12, 1900, c. 191, 31 Stat. 77, known as the Foraker Act; Act of Puerto Rico, of March 2, 1917, c. 145, 39 Stat. 951, known as Jones Act.

5. Section 3, Clause 2 of the Article Four of the Constitution of the United States provides in pertinent part as follows:

"The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other property belonging to the United States . . ."

6. Public Law 600, July 3, 1950, c. 446, 64 Stat. 319.

by the direct secret vote of all the qualified electors of Puerto Rico, a series of politico-juridical events took place in Washington and in Puerto Rico which changed the relationship between the then territory of Puerto Rico, on the one part, and the United States, on the other. Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in Article IV, Section 3, Clause 2 of the Federal Constitution. From July 25, 1952, in which the Commonwealth of Puerto Rico was born, Puerto Rico ceased being governed by the unilateral will of the Congress; now it is being governed by the express, though generic, consent of its people, through a compact with Congress. Whatever authority was to be exercised over Puerto Rico by the Federal government would emanate thereon, not from Article IV of the Constitution, but from the Compact itself, voluntarily and freely entered into by the people of Puerto Rico, even without an express recognition of its sovereignty, and the Congress; a compact which cannot be unilaterally revoked either by Congress or by the people of Puerto Rico.[7]

With all this in mind, let us examine, from the facts here involved, the position of the defendant in this case, a position it wishes the Court to adopt as its own. Before 1952 the field of labor relations was preempted by the federal power, in the industries that Congress wanted to regulate, as far as the Constitution allowed it to extend its hand. In the case of the federated states of the United States, this was limited to those businesses "affecting" interstate commerce and was constitutionally grounded in the interstate commerce clause.—Art. 1, Sec. 8, cl. 3, of the Constitution of the United States. In the case of the territories and the District of Columbia, the preemption of the field was not limited to the activities affecting commerce. Congress, which had all the power imaginable under Article IV, and Article I, Sec. 8, cl. 1, respectively, decided to exercise it and, preempting the field, controlled even local enterprises which had no impact whatsoever upon [interstate] commerce as to affect it, even in the slightest respect. Thus, the National Labor Relations Act, more frequently referred to as the Wagner Act,[8] since 1935, and later the Labor Management

7. For a detailed discussion about the binding effect of the compact, see United States v. Valentine, 288 F.Supp. 957 (D.C.P.R.1968). See also, Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Company, 303 F.Supp. 414 (D.C.P.R.1968); Krisel v. Duran, 386 F.2d 179 (2d Cir. 1967), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968); Americana of Puerto Rico, Inc. v. Kaplus, 368 F.2d 431 (3d Cir. 1966); cert. denied, 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed. 2d 874 (1967); United States v. de Jesús, 289 F.2d 37 (2d Cir. 1961), cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1254 (1961); Valpais v. United States, 289 F.2d 607 (1st Cir. 1961); Moreno Ríos v. United States, 256 F.2d 68 (1st Cir. 1958); Darío Sánchez v. United States, 256 F.2d 73 (1st Cir. 1958); cert. denied, 372 U.S. 931, 83 S.Ct. 877, 9 L.Ed.2d 734 (1963); Detres v. Lions Bldg. Corp., 234 F.2d 596 (7th Cir. 1956); Mora v. Mejías, 206 F.2d 377 (1st Cir. 1953); Feliciano v. United States, 297 F.Supp. 1356 (D.P.R.1969); Alcoa Steamship Co. v. Pérez, 295 F.Supp. 187 (D.P.R. 1968); Cooperativa de Seguros Múltiples de Puerto Rico v. San Juan, 289 F.Supp. 983 (D.P.R.1968); David Cabrera, Inc. v. Unión de Choferes y Dueños, 256 F.Supp. 839 (D.

P.R.1956); Securities and Exchange Commission v. Quing N. Wong, 252 F.Supp. 608 (D.P.R.1966); Kane v. República de Cuba, 211 F.Supp. 855 (D.P.R.1962); Lummus Co. v. Commonwealth Oil Refinery Co., 195 F. Supp. 47 (S.D.N.Y.1961); Trigo Bros. v. Davis, 159 F.Supp. 841 (D.P.R.1958), vacated on other grounds, 266 F.2d 174 (1st Cir. 1959); Mitchell v. Rubio, 139 F.Supp. 379 (D.P.R.1956); United States v. Figueroa Ríos, 140 F.Supp. 376 (D.P.R.1956); United States v. Mejías, 131 F.Supp. 957 (D.P. R.1955); Cosentino v. International Longshormen's Ass'n, 126 F.Supp. 420 (D.P.R. 1954); Carrión v. González, 125 F.Supp. 819 (D.P.R.1954); Arbona v. Kenton, 126 F.Supp. 366 (S.D.N.Y.1954); Mora v. Mejías, 115 F.Supp. 610 (D.P.R.1953); Hilton Hotels International, Inc., 37 L.R.R. M.1474 (P.R.Lab.Rel.Bd.1955). Any expression of this Court to the contrary in the case of Murga v. Secretary of Health, Education and Welfare, Civ. 51–70, (D.C.P.R., Dec. 30, 1971) which was not intended to be published nor was published by the Court, may be disregarded.

8. Act of July 5, 1935, c. 372, § 1 et seq., 49 Stat. 449.

Relations Act, 1947, more frequently cited as the Taft-Hartley Act,[9] defined commerce, in the case of the federated states as interstate commerce, and in the case of the territories as "commerce *within* . . . any territory." (Emphasis added). It was perfectly clear that until July 25, 1952 all commerce *within* Puerto Rico, no matter how local in character, was covered by the labor laws. Since that date on, the administration of the Taft-Hartley Act, for whatever reasons that may have been taken in consideration by the pertinent federal authorities, has not extended beyond what in the federated states would be considered as interstate commerce. Therefore, as a practical matter there was no conflict which could prompt any party in Puerto Rico to raise the non-applicability of Taft-Hartley to local enterprises; that is to say, to activities which do not affect interstate commerce. Something more than a mere insinuation to that effect was expressed by this court, through Judge Cecil Snyder, in Cosentino v. ILA.[10]

█ This Court sees the situation today as follows: Since the creation of the Commonwealth and the recognition by the Congress of the right of the People of Puerto Rico to form their own local government and govern themselves in all local matters, recognizing "in the nature of a compact" the Commonwealth's authority over its own local affairs, Congress ceased having authority over those local matters which now can be dealt with only by the Commonwealth in the exercise of its local authority, not ceded by Congress as a mere act of grace under Article IV of the Constitution, as it did to a certain extent in 1900 and 1917 in the Organic Acts, but as a compact with the people of Puerto Rico. Consequently, as far as local commerce (as distinguished from interstate commerce) is concerned, Congress is barred from regulating it in the manner it used to before 1952 and still can do in relation with the territories. By entering in the compact between 1950 and 1952,[11] Congress agreed to limit itself permanently from interfering in the local affairs of the people of Puerto Rico. As a matter of reality, after 1952 Congress has not attempted to exercise the right it no longer possesses. What this case poses is not that lack of authority on the part of Congress. Defendant's position goes further and claims lack of power of Congress to regulate commerce, as far as Puerto Rico is concerned, no matter under what authority, even those activities which it regulates in the federated states under the authority of the interstate commerce clause. It pretends to have the Court go one step further and rule that Congress does not have, since 1952, a power it does possess over the federated states; the power to regulate activities traditionally considered to affect interstate commerce. That we cannot do.

█ In arguing that the interstate commerce clause does not apply to Puerto Rico,[12] defendant contends that Congress cannot validly regulate interstate commerce in the case of Puerto Rico. We do not agree. That was not the intention of the parties to the compact in 1950; that could not have been their intention, neither then nor at any other time to present date. The Court has carefully reviewed the whole legislative record related to the events that took place in connection with the creation of the Commonwealth, both in Washington and in San Juan, and cannot find one

---

9. Act of June 23, 1947, c. 120, Title I, Sec. 101 et seq., 61 Stat. 136.

10. 126 F.Supp. 420 (D.C.P.R.1954).

11. In addition to Public Law 600 of July 3, 1950, Congress approved Public Law 82–447, c. 567, July 3, 1952, 66 Stat. 327, and the President approved the Constitution.

12. Section 38 of the Federal Relations Act, 48 U.S.C. § 751, states that the Interstate Commerce Act and its present and future amendments do not apply to Puerto Rico. It is silent as to whether the commerce clause of the Federal Constitution applies or not to the Commonwealth.

single instance from which any reasonable mind can conclude that Puerto Rico asked for, or the United States agreed to, have the federal government ousted from any part of its authority over matters which it then regulated in Puerto Rico and which it still regulates in the case of the federated states.

 Without having to decide whether the interstate commerce clause applies to Puerto Rico, and even assuming, as defendant claims, that it does not,[13] it seems clear that there was no intention on the part of Congress and the people of Puerto Rico to deprive Congress of the powers similar to the ones it has in this field over the states. At least, there is no doubt that the Taft-Hartley Act, and laws similar to it that were being applied to activities in Puerto Rico which affect interstate commerce in the traditional sense, continued to apply to Puerto Rico only to those activities after 1952. And there is no indication to the contrary in the will expressed by both parties to the compact. No one even suggested the possibility of banning the Labor Act from Puerto Rico in its entirety. If this is true of the Act as it existed in 1952, the same is true of the amendments that Congress has seen fit to make to it after that date. Specifically, the same is true of the Landrum-Griffin Act,[14] the one at stake in this case, and of future laws regulating the same type of activities—in this case labor relations—to the same extent that they were validly regulated in 1952 in the several states. Whatever limitation in the power of Congress were placed by the 1950–1952 compact, it never could have gone so far as precluding Congress from regulating labor matters in those activities which, as the ones here involved, are not local in character. Even extending the highest respect for the Puerto Rico local autonomy, which we do, and which Congress must, the regulation of the activities purported to be regulated by the federal authorities in this case do not limit in any manner the local autonomy of the Commonwealth. In fact, the activity here involved is of the same type as similar activities carried on in the federated states which fall squarely under the federal control, without any state claiming that its local autonomy is being constitutionally restricted by the federal authorities.[15]

13. Although it becomes unnecessary to decide this question, it is important to clarify that interstate commerce does in fact exist between Puerto Rico and the United States. However, the power to control such an interstate commerce relationship which once fell under Article IV, Sec. 3, cl. 2, now derives from the compact as provided in Public Law 600, Federal Relations Act, and Public Law 447. It is the source of power which changed, not the relationship itself. See R. C.A. v. Gobierno de la Capital, 91 P.R.R. 404 (1964). See also, Buscaglia v. Ballester, 162 F.2d 805, 806–807 (1st Cir., 1947), where the Court of Appeals explicitly recognized Article IV, Sec. 3, cl. 2 of the Federal Constitution as the exclusive fountainhead of congressional power to regulate interstate commerce accepting the then territory of Puerto Rico.

14. Public Law 86–257, Sec. 1 et seq., Sept. 14, 1959, 73 Stat. 519.

15. Section 9 of the Federal Relations Act, 48 U.S.C. § 734, provides in pertinent part as follows:

"The statutory laws of the United States not locally inapplicable, except as herein-before or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States . . . ."

We believe that within the scope and intendment of the phrase "statutory laws of the United States not locally inapplicable" is included the Labor Management Reporting and Disclosure Act, Note 12, *supra* (L.M.R.D.A.). Indeed, in its congressional findings, purposes and policy, set out at the beginning of L.M.R.D.A., 29 U.S.C. § 401, after reiterating more or less the same considerations which prompted it to enact the Taft-Hartley Act, Note 6, *supra*, Congress declares:

". . . from recent investigations in the labor field . . . there have been a number of instances of breach of trust, corruption, disregard of the right of individual employees, and other failure to observe high standards of responsibility and ethical conduct which require *further and supplementary legislation* that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations

62

In view of the above, the motion to dismiss filed by defendant herein is denied. Trial of this cause on the merits is to be set before another Judge of this court.

It is so ordered.

consultants and their officers or representatives." (Emphasis added.)

It further finds that the enactment of this Act is necessary for the policies of the Taft-Hartley Act not to be distorted and defeated.

It can be inferred from the language quoted above that the L.M.R.D.A. is not a "new" statutory law, necessitating close scrutiny to determine whether it falls outside the ambit of Section 9, but an extension of pre-1952 congressional enactment covering the same labor relations field which the pre-Commonwealth Taft-Hartley Act covered, although fashioning new means and remedies of regulating the activities of labor-management and making more effective and advancing the policies which necessitated the former legislation.

It would be absurd to say that when the people of Puerto Rico consented to the applicability of the Taft-Hartley Act in the Commonwealth, they simultaneously rejected any supplementary legislation by Congress that would keep the initial legislation responsive to the needs, purposes and policies prompting its enactment. Such an erosion of the effectiveness of the Taft-Hartley Act through supervening circumstances could not have been intended by the parties to the compact, unless such an enterprise was merely pro-forma and meaningless.