UNITED STATES of America, Plaintiff,

v.

Jose VEGA FIGUEROA (# 1) a/k/a Pito Casco, Defendant.

No.Crim. 97–072(SEC).

United States District Court, D.Puerto Rico.

Oct. 17, 1997.

©~186

Jacabeth Rodriguez, Asst. U.S. Atty., Hato Rey, PR, for Plaintiff.

Alberic Prados–Bou, Caguas, PR, for Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

The question before the Court is not one of first impression. Defendant is basically asking us to revisit the issue of whether Puerto Rico and the United States are "dual sovereigns" for purposes of the United States Constitution's Double Jeopardy Clause (**Docket # 124**).[1] For the reasons stated below, we hereby decline his invitation to do so.

**Procedural Background**

Three years ago, defendant, José Vega Figueroa, was charged with the commission of ten offenses in the Superior Court of Carolina, Puerto Rico. The charges against him included unlawful possession, use, and transportation of the following firearms: (1) an AK–47 rifle; (2) a 9mm. caliber pistol; (3) a .357 magnum; and (4) a .38 caliber revolver; and (5) a .45 caliber pistol. They also included two counts of murder in the first degree for the murders of Reynaldo Colón–Figueroa a/k/a "Rey" and Melvin Flores–Montalvo; and the attempted murders of Ramón Santiago–Casiano and Angel Ramos–Rivera.

On October 11, 1995, Vega was acquitted of all these charges. Almost two years later, however, a federal grand jury charged him with knowingly and intentionally using and carrying the foregoing firearms. It further charged him with ordering and/or undertaking the murder of Reynaldo Colón–González a/k/a "Rey", Melvin Flores–Montalvo, Angel Ramos–Rivera a/k/a "Yauco", Ramón Santiago–Casiano a/k/a "Degollao", Pedro Santiago–Vega, and Wilfredo Cruz a/k/a "Galopa".

Defendant contends that he is being charged with the commission of essentially the same crimes for which he was acquitted in 1995, and that this Court should thus dismiss Count Three of his indictment—which pertains to the possession and use of these firearms—on double jeopardy grounds. He also maintains that the Court should dismiss paragraphs five, six, and seven of the subsection which refer to "overt acts", on collateral estoppel grounds.

Defendant acknowledges that it is a well established criminal law principle that successive prosecutions for the same unlawful act do not violate the United States Constitution when they are brought under the laws of

---

1. The Double Jeopardy Clause provides that no person shall be "subject for the same offence to be twice put in Jeopardy of life or limb." U.S. Const. amend. V.

separate sovereigns. He maintains, however, that Puerto Rico is neither a state nor a sovereign nation, and that the preceding principle cannot, therefore, apply to the instant controversy.

To support his contention, defendant argues that when Congress enacted Public Law 600, 64 Stat. 319 (1950)—the act which lay the groundwork for the Island's current political and constitutional status—it merely meant to allow the people of Puerto Rico a certain degree of self government in local affairs. The measure was not, according to him, meant to change Puerto Rico's fundamental relationship to the United States. Defendant further asserts that acts of Congress do not need to bind future Congresses, and that both the judicial and the legislative branches have recently recognized that Congress may treat Puerto Rico differently from the fifty states—to the extent that it may even unilaterally repeal the Island's Constitution and replace it with the rules and regulations it deems appropriate—because the Commonwealth of Puerto Rico is, and has always been, an unincorporated territory.[2] As to the conspiracy–related counts, defendant maintains that the collateral estoppel doctrine bars their prosecution because in order to prove Count Three of the indictment, the Government must bring forth proof of the overt acts for which defendant was already acquitted.

In response to the foregoing arguments, the Government contends that the First Circuit has clearly established that Puerto Rico is a sovereign for purposes of the Double Jeopardy Clause, and that this district is bound by such a holding.[3] In the alternative, plaintiff argues that no double jeopardy may be found in cases such as this one, where the instant statutory offense requires that the Government prove a fact which was not required of the previous offense. Finally, the Government contends that the non–mutual collateral estoppel doctrine does not apply to this controversy because the overt acts to which Vega refers are not essential in drug conspiracy cases, and, more importantly, because the ultimate issues pending before this Court were not before the local jury.

**Applicable Law/Analysis**

 Prosecuting entities are considered to be separate for double jeopardy purposes when they derive their power from different sources. It is well settled that when states enact and enforce their own criminal laws, they are acting pursuant to their own sovereign power, not that of the national government. Puerto Rico's status is not that of a state in the federal union, but its criminal laws, like those of a state, emanate from a different source than the federal laws.

Defendant's contention is that the Commonwealth of Puerto Rico is, constitutionally, still a territory of the United States, and that it lacks that separate sovereignty which would allow the federal prosecution in this case to continue. Thus, defendant questions the very nature of the present constitutional status of Puerto Rico.[4]

██ Since 1953, it is well settled law in this Circuit that, with the advent of Commonwealth status in 1952, Puerto Rico ceased

---

2. Defendant supports this assertion with the Supreme Court case of *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980); the Eleventh Circuit case of *United States v. Sanchez*, 992 F.2d 1143 (11th Cir.1993), and H.R. 856, more commonly known as the "Young Bill," which is currently pending before Congress.

3. In support of this contention, plaintiff refers to the First Circuit case of *United States v. Lopez Andino*, 831 F.2d 1164 (1st Cir.1987).

4. In its Report, the "Ad Hoc Advisory Group on Puerto Rico", which was appointed by President Nixon and which included members of Congress, described the Commonwealth status as follows:
 The Commonwealth relationship between Puerto Rico and the United States was established through bilateral agreement between the people of Puerto Rico and the Congress of the United States. Through Congressional enactment of Public Law 600, 81st Congress, 1950, section 4 of which constitutes the Puerto Rican Federal Relations Act, and through the acceptance of that law, in referendum, by the Puerto Rican electorate, and further through the adoption of a constitution of their own choosing, a new form of Federal association, in the nature of a compact, was created between the United States and Puerto Rico. The crucial aspect of this process was its mutual acceptance by the electorate of Puerto Rico and by the Congress of the United States.
 Report, at 1 (1975).

being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution.[5] Thereafter, the authority exercised by the federal government emanated from the compact entered into between the people of Puerto Rico and the Congress of the United States. As Judge Magruder stated in *Mora v. Mejias,* 206 Fed.2d 377, 386 (1st Cir.1953), referring to the new Commonwealth: "It is a political entity created by the act and with the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact . . .".[6]

In 1956, Judge Magruder addressed the issue once again, in a case in which the contention was that there was only one sovereignty in Puerto Rico; that of the federal government. His response is best captured in the following paragraph:

"The answer to appellant's contention is that the Constitution of the Commonwealth is not just another Organic Act of the Congress. We find no reason to impute to the Congress the perpetration of such a monumental hoax. Public Law 600 offered to the people of Puerto Rico a 'compact' under which, if the people accepted it, as they did, they were authorized to 'organize a government pursuant to a constitution of their adoption' ".

*Figueroa v. People of Puerto Rico,* 232 F.2d 615, 620 (1st Cir.1956).[7]

Neither has the United States Supreme Court remained silent on the status issue. The Supreme Court first addressed the subject in the 1974 case of *Calero–Toledo v.*

---

5. *Mora v. Torres,* 113 F.Supp. 309 (D.P.R.1953); *Mora v. Mejias,* 206 F.2d 377 (1st Cir.1953); *Mora v. Mejias,* 115 F.Supp. 610 (D.P.R.1953); *Cosentino v. International Longshoremen's Ass'n District Council of Ports of Puerto Rico,* 126 F.Supp. 420 (D.P.R.1954); *Carrion v. Gonzalez* 125 F.Supp. 819 (D.P.R.1954); *Mitchell v. Rubio,* 139 F.Supp. 379 (D.P.R.1956); *United States v. Figueroa Rios,* 104 F.Supp. 376 (D.P.R.1956); *Figueroa v. People of Puerto Rico,* 232 F.2d 615 (1st Cir.1956); *Moreno Rios v. United States,* 256 F.2d 68 (1st Cir.1958); *Sanchez v. United States,* 256 F.2d 73 (1st Cir.1958); *Alcoa S.S. Co. v. Perez,* 295 F.Supp. 187 (D.P.R.1968), *aff'd,* 424 F.2d 433 (1st Cir.1970); *United States v. Feliciano–Grafals,* 309 F.Supp. 1292 (D.P.R.1970); *Hodgson v. Union De Empleados De Los Supermercados Pueblos,* 371 F.Supp. 56 (D.P.R.1974); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *First Federal Sav. and Loan Ass'n of Puerto Rico v. Ruiz De Jesus,* 644 F.2d 910 (1st Cir.1981); *Cordova v. Chase Manhattan Bank,* 649 F.2d 36 (1st Cir.1981); *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982); *United States v. Quinones,* 758 F.2d 40 (1st Cir.1985); *U.S. v. Lopez Andino,* 831 F.2d 1164 (1st Cir.1987).

6. The Supreme Court of Puerto Rico has also held that under the Commonwealth status the people of Puerto Rico obtained recognition of a full measure of self–government in local affairs and became an autonomous body politic associated with the United States by means of a compact. In *People v. Figueroa,* 77 P.R.R. 175 (1954) Chief Justice Snyder stated that: "The subsequent role of Congress did not result in making the Constitution a federal law. Rather . . . 'pursuant to congressional authority . . . the Constitu-

---

tion was approved by the people and accepted by Congress in 1952.' It follows that our Constitution is a local Constitution and not a federal law". *See also RCA v. Govt. of the Capital,* 91 P.R.R. 404 (1964); *El Pueblo De Puerto Rico v. Castro Garcia Y Otro,* 120 D.P.R. 740 (1988).

7. At the international level, the United States informed the United Nations as follows:

The Federal Relations Act to which reference has been made has continued provisions of political and economic union which the people of Puerto Rico have wished to maintain. In this sense the relationships between Puerto Rico and the United States have not changed. It would be wrong, however, to hold that because this is so and has been so declared in Congress, the creation of the Commonwealth of Puerto Rico does not signify a fundamental change in the status of Puerto Rico. The previous status of Puerto Rico was that of a territory subject to the full authority of the Congress of the United States in all governmental matters. The previous constitution of Puerto Rico was in fact a law of the Congress of the United States, which we called an Organic Act. Only Congress could amend the Organic Act of Puerto Rico. The present status of Puerto Rico is that of a people with a constitution of their own adoption, stemming from their own authority, which only they can alter or amend. The relationships previously established also by a law of the Congress, which only Congress could amend, have now become provisions of a compact of a bilateral nature whose terms may be changed only by common consent.

Statement of the Hon. Frances P. Bolton, American Delegate. Report, April 26, 1954, printed for the use of the Committee on Foreign Affairs, 83rd Cong., 2d Sess., Washington, D.C., U.S. Government Printing Office 241 (1954).

*Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), where, citing Judge Magruder's holding in *Mora v. Mejias* with approval, Justice Brennan, writing for the majority, acknowledged that:

> [b]y 1950, ... pressures for greater autonomy led to [the] congressional enactment of Pub.L. 600, 64 Stat. 319, which offered the people of Puerto Rico a compact whereby they might establish a government under their own Constitution. Puerto Rico accepted the compact and on July 3, 1952, Congress approved, with minor amendments, a Constitution adopted by the Puerto Rico populace.

*Id.* at 671–72.

Two years later, in 1976, the Supreme Court in *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976), and citing *Calero–Toledo*, stated that "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with states

of the union ...". It then went on to recognize: "We readily concede that Puerto Rico occupies a relationship to the United States that has no parallel in our history ...". *Id.* 426 U.S. at 596, 96 S.Ct. at 2278.[8]

It is important to note that defendant's specific contention—that Puerto Rico is an unincorporated territory[9] of the United States and that no dual sovereignty exists between the United States and the Commonwealth—has for the past fifteen years been the subject of an uninterrupted and consistent line of First Circuit case law.[10] In *First Federal Sav. and Loan Ass'n of Puerto Rico v. Ruiz De Jesus*, 644 F.2d 910 (1st Cir.1981), for example, Judge Campbell held that "Puerto Rico's territorial status ended, of course, in 1952. Thereafter it has been a Commonwealth with a particular status as framed in the Puerto Rico Federal Relations Act ." *Id.* at 911.

That same year, and upon reviewing the history leading up to the creation of the Commonwealth of Puerto Rico, Judge—now Justice—Breyer, concluded that

---

**8.** For more information regarding the status of Puerto Rico *see*, José Trías Monge, *Puerto Rico—The Trials of the Oldest Colony in the World*, (Yale Univ. Press 1997); Arnold Leibowitz, *Defining Status—A Comprehensive Analysis of United States Territorial Relations*, (Kluger Academic Publishers 1989); Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal*, (U.P.R. Press 1985); Arnold Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 56 Geo. L.J. 219 (1967); Calvert Magruder, *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L.Rev. 1 (1953); Pedro Muñoz–Amato, *Congressional Conservatism and Puerto Rican Democracy in the Commonwealth Relationship*, 21 Rev. Jur. U.P.R. 321 (1952); Jorge Morales–Yordan, *The Constitutional and International Status of the Commonwealth of Puerto Rico*, 18 Rev C. Abo. P.R. 5 (1957); Helen Silving, *In the Nature of a Compact*, 20 Rev C. Abo. P.R. 159 (1960); Rafael Hernández–Colón, *The Commonwealth of Puerto Rico: Territory or State?*, 19 Rev C. Abo. P .R. 207 (1959); Juan M. García–Passalacqua, *The Legality of the Associated Statehood of Puerto Rico*, 4 Inter–Am. L.Rev. 287 (1962); Rubén Rodríguez Antongiorgi, *Review of Federal Decisions on the Applicability of United States Laws in Puerto Rico* ..., 26 Rev. U.P.R. 321 (1957); Jaime B. Fuster, *The Origins of the Doctrine of Territorial Incorporation* ... 43 Rev. Jur. U.P.R. 259 (1974).

**9.** For a recent review of the "Insular Cases" which created the status of "unincorporated ter-

ritory," *see* Efrén Rivera Ramos, *The Legal Construction of American Colonialism: The Insular Cases* (1901–1922), 65 Rev. Jur. U.P.R., 225 (1996). For an earlier view *see*, Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal*, (U.P.R. Press 1985).

**10.** It should be noted that the Supreme Court of Puerto Rico has also recognized and held that the dual sovereignty doctrine has applied to Puerto Rico since the adoption of its Constitution in 1952. *See El Pueblo De Puerto Rico v. Castro-Garcia*, 120 D.P.R. 740 (1988). Moreover, the existence of local sovereignty is clearly reflected in the Constitution of the Commonwealth of Puerto Rico, approved by Congress in 1953 (PL 447, 82nd Congress):

> We understand that the democratic system of government is one in which *the will of the people is the source of public power*, the political order is subordinate to the rights of man, and the free participation of the citizen in collective decisions is assured; ... The Commonwealth of Puerto Rico is hereby constituted. *Its political power emanates from the people and shall be exercised in accordance with their will*, within the terms of the compact agreed upon between the people of Puerto Rico and the United States of America.

P.R. Const. Preamble; art. I, emphasis added.

[i]n sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rico Federal Relations Act and the rights of the people of Puerto Rico as United States citizens. As the Supreme Court has written, the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a state of the union. *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976) . . .

*Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A.,* 649 F.2d 36, 39–41 (1st. Cir.1981). Subsequently, in 1985, Judge Bownes addressed this issue in *United States v. Quinones,* 758 F.2d 40 (1st Cir. 1985), where he stated that

in 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution. The authority exercised by the federal government emanated thereafter from the compact itself. Under the compact between the people of Puerto Rico and the United States, Congress cannot amend the Puerto Rico Constitution unilaterally, and the government of Puerto Rico is no longer a federal government agency exercising delegated power ... Under its Commonwealth status, Puerto Rico, like a state, is an autonomous political entity, sovereign over matters not ruled by the Constitution. *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982).

*Id.* at 42. Finally, in a case which expressly rejects defendant's contention, the First Circuit in *United States v. Lopez Andino,* 831 F.2d 1164 (1st Cir.1987); *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2018, 100 L.Ed.2d 605 (1988), held that:

[a]lthough the legal relationship between Puerto Rico and the United States is far from clear and fraught with controversy, it is established that Puerto Rico is to be treated as a state for purposes of the Double Jeopardy Clause. In 1950 Congress enacted legislation so that the people of Puerto Rico may organize a government pursuant to a Constitution of their own adoption. Puerto Rican Federal Relations Act, Pub.L. No. 600, 64 Stat. 319 (1950) The purpose of the Federal Relations Act 'was to accord to Puerto Rico that degree of autonomy and independence normally associated with the states of the union,' *Examining Bd. of Engineers v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976). 'Puerto Rico, like a state, is an autonomous political entity ...' *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982).

*Id.* at 1168.[11]

The defendant alludes to other cases and authorities in an effort to persuade us to revisit this Circuit's long standing and well-settled doctrine regarding the present constitutional status of the Commonwealth of Puerto Rico. As stated previously, we decline to accept the invitation, not only because as a district court we are bound by the precedent set by the Court of Appeals for the First Circuit, as well as by Supreme Court precedent, but also because we disagree on the merits with the position that defendant currently espouses. Notwithstanding the foregoing, we understand that the defendant's arguments need to be placed in the proper legal perspective, and thus warrant further comment.

Defendant refers to the case of *Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) as authority for his proposition that Puerto Rico continues to be an unincorporated territory and that therefore, there is no "dual sovereignty" issue in the present case. *Harris,* decided by the Supreme Court in a short *per curiam* opinion, dealt with the question of whether it was

---

**11.** For a different view, *see* Judge J.R. Torruella's concurring opinion in *Lopez Andino.*

constitutional for an act of Congress to deny Puerto Rico residents benefits under a federal welfare program which would have otherwise been available to those U.S. citizens if they had resided on the mainland.[12] To justify this unequal treatment between residents of Puerto Rico and those of the several states, the Court, in its brief discussion, made reference to the Territorial Clause of the U.S. Constitution, and held that Congress "may treat Puerto Rico differently from states so long as there is a rational basis for its actions". *Id.* at 651-52, 100 S.Ct. at 1929-1930. The Court did not, however, hold—or even suggest—that Puerto Rico was an unincorporated territory. The holding of the Court in *Harris* was limited to the fact that Congress can treat the Commonwealth of Puerto Rico differently from the fifty states for the purposes of an entitlement program.

The fact that the Court in passing referred to the Territorial Clause of the Constitution, as the source of its power to treat Puerto Rico differently from States, does not mean that the Commonwealth is constitutionally a "Territory" of the United States, although in a geographic sense, the island continues to be territory of the United States. Nor does it mean that after 1952, Congress continued to

have plenary and untrammeled power over Puerto Rico, even though the Commonwealth continues under the common national sovereignty just as the States of the Union are constitutionally under such sovereignty.

Although Congress may have other constitutional sources of power to determine Puerto Rico's status, such as the treaty making power,[13] this does not detract from the fact that the Territorial Clause continues to be the principal source of federal power over non-state areas. The authority of Congress under the Territorial Clause has been held to be very broad and only subject to certain basic constitutional limitations.[14] It is precisely because of this broad grant of constitutional power, that Congress has wide latitude in exercising such power.[15]

While Congress has broad power to govern the non-state areas, it need not exercise that power itself. Congress can delegate to the inhabitants of non-state areas full power of self-government and an autonomy similar to that of the States and has done so since the beginning of the Republic. It can also dispose of the territory and relinquish all sovereignty as it did in the case of the Philippines. If it can relinquish all sovereignty, it stands to reason that it can also

**12.** Puerto Ricans were granted United States citizenship in 1917 when the U.S. Congress enacted the Jones Act, 39 Stat. 951 (1917). For a history of the granting of U.S. citizenship to Puerto Rico, *see* Jose Cabranes, *Citizenship and the American Empire,* (Yale Univ. Press 1979). In 1952, Congress enacted the Immigration and Nationality Act (I.N.A.), 66 Stat. 166 (1952). Section 1101(a)(38) of the Act states that "[t]he term 'United States,' . . . means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C.A. § 1101(a)(38). It thus included people born in Puerto Rico as being "born in the United States." Also through the I.N.A. of 1952, the Congress declared that:

[a]ll persons born in Puerto Rico on or after April 11, 1899, and prior to January 13, 1941, subject to the jurisdiction of the United States, residing on January 13, 1941, in Puerto Rico or other territory over which the United States exercises rights of sovereignty and not citizens of the United States under any other Act, are declared to be citizens of the United States as of January 13, 1941. All persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, are citizens of the United States at birth.

8 U.S.C.A. § 1402.

**13.** Article IX of the treaty of Paris provided that "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress." 20 U.S. Stat. 1754, 1759 (1899).

**14.** *Murphy v. Ramsey,* 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885), *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Balzac v. People of Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922).

**15.** The power of Congress under the Territorial Clause is so broad that it can purchase territory outright such as Louisiana, Florida, Alaska and the Virgin Islands; or acquire it through war such as the Philippines, Puerto Rico and Guam from Spain in 1898. Utilizing that same broad power, the Congress can govern the acquired territory either as dependencies, such as were Louisiana and Florida initially; or organized territories such as those destined for eventual statehood; or unincorporated territories such as the Philippines, Guam, the Virgin Islands, and, prior to 1952, Puerto Rico.

enter into a series of intermediate stages of empowerment [16] through which non–state areas can continue to be associated with the Federal Government; are granted and exercise sovereignty over local affairs; and remain under the umbrella of national sovereignty.[17]

Congress certainly exercised the latter form of power when it entered into a compact with the people of Puerto Rico in 1952, and allowed Puerto Ricans to exercise popular sovereignty within the sphere of their own Constitution. Through this compact, Congress expressly recognized the principle of mutuality and relinquished its plenary powers over areas of local sovereignty. Ever since then, a dual sovereignty relationship has been established, whereby the Federal Government exercises its sovereignty within its reserved sphere of power, and the Commonwealth government, acting not unlike a state government, exercises its sovereignty within the sphere expressly determined by its own Constitution.[18]

In sum, we believe that the holding in *Harris*—that Puerto Rico is not a state for certain constitutional purposes—is nothing more than a self–evident proposition. The Supreme Court in *Harris* recognized the long established doctrine that there are differences between the way that federal laws apply to Puerto Rico and the way they apply in the fifty states.[19] Moreover, in all the cases after *Harris* in which the Supreme Court has been confronted with an issue regarding the constitutional nature of the Commonwealth of Puerto Rico, the Court has in effect validated the existence of the compact, as well as the non–territorial nature of the Commonwealth. *See, e.g., Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), where the Supreme Court held that "Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution'." *Id.* at 8, 102 S.Ct. at 2199. *See also Posadas de Puerto Rico Assoc. v. Tourism Co. of P.R.*, 478 U.S. 328, 339, 106 S.Ct. 2968, 2975, 92 L.Ed.2d 266 (1986), *citing Calero* with approval.

Furthermore, we note that the First Circuit has not interpreted *Harris*—which was decided in 1980—as in any way changing the well–settled law regarding the constitutional nature of the Commonwealth of Puerto Rico. *See, e.g., Cordova & Simonpietri v. Chase Manhattan Bank*, 649 F.2d 36, 39–41 (1st Cir.1981); *United States v. Quinones*, 758 F.2d 40 (1st Cir.1985); and *United States v. Lopez Andino*, 831 F.2d 1164, 1168 (1st Cir. 1987), all of which were decided after *Harris*.

The defendant also refers to the case of *United States v. Sanchez*, 992 F.2d 1143 (11th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994), as authority for his proposition that Puerto Rico is not a separate sovereign under the Double Jeopardy Clause of the U.S. Constitution. In *Sanchez*, the Eleventh Circuit essentially held that Puerto Rico was still constitutionally a territory, and not a separate sovereign.[20]

---

**16.** "The greater power includes the lesser power" is a long–established maxim. Perhaps the most influential exponent of this maxim was Justice Holmes, who began expounding the doctrine while still at the Supreme Court of Massachusetts. *See, e.g., McAuliffe v. City of New Bedford*, 155 Mass. 216, 29 N.E. 517 (1892); *Commonwealth v. Davis*, 162 Mass. 510, 39 N.E. 113 (1895). For a recent application of the maxim by the United States Supreme Court, *see Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 345–46, 106 S.Ct. 2968, 2979, 92 L.Ed.2d 266 (1986) ("In our view, the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling...").

**17.** Examples are the Commonwealth of the Philippines created in 1934, and the Commonwealth of the Northern Marianas established through a covenant adopted by mutual consent in 1975.

**18.** It should be noted, however, that in recent years there has been a growing disenchantment with Commonwealth status, even among its original founders, largely due to the widening sphere of federal authority which has developed without effective local participation, as well as the concomitant reduction in the sphere of Commonwealth authority. *See* Trías Monge, *supra* note 8.

**19.** The Supreme Court first addressed this issue in a brief, *per curiam* opinion in *Califano v. Gautier Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978), where it held that Congress could provide lower Social Security benefits to the residents of Puerto Rico.

**20.** *But see Romero v. United States*, 38 F.3d 1204, 1208 (Fed.Cir.1994), which held that:

On July 3, 1952, Congress approved the proposed Constitution of the Commonwealth of

In so doing, that case—which is not binding and does not constitute precedent for this Court—completely disregarded the long line of decisions which the First Circuit has rendered since 1953, and which the Supreme Court has issued since 1974, regarding the constitutional status of the Commonwealth of Puerto Rico. To the extent that it did so, we respectfully disagree with the holding in *Sanchez*. As stated previously, it is not appropriate for this Court to revisit and modify the long–held and well–settled doctrine regarding the constitutional nature of the Commonwealth of Puerto Rico.

In a last attempt at persuading the Court, defendant relies on the current proposed legislation introduced in Congress to hold a referendum regarding the future status of Puerto Rico as a justification for his plight. He specifically refers to certain findings contained in H.R. 856, a bill pending in Congress and entitled "United States—Puerto Rico Political Status Act". The Committee on Resources of the House of Representatives, to whom the bill was referred, approved the same; however, as of this date, it has not been approved by the House of Representatives.

The defendant points out that, among the findings contained in the proposed bill and approved by the Committee on Resources, there is one which concludes that the "establishment of local constitutional government in 1952 did not alter Puerto Rico's status as an unincorporated United States territory." *See* H.R. 856 Section 2, 7. Defendant further refers to another finding which defines Puerto Rico as "an unincorporated territory of the United States." *See* H.R. 856 Section 4(a)(A)(2).[21]

Defendant's reference to the contents of H.R. 856 in an attempt to redefine the nature of the present constitutional status of Puerto Rico as that of a territory is inappropriate for two important reasons. The first is that H.R. 856 is a proposed bill which, albeit approved by a committee of the House of Representatives, has not been approved by this legislative body, or by the Senate for that matter. Therefore, the bill does not have any legal validity until it becomes law, if approved by Congress and signed by the President.

The second reason why it would not appear to be appropriate at this stage to refer to H.R. 856, and the findings contained therein, in order to determine the present status of the Island is that the nature of the constitutional status of Puerto Rico has already been the subject of extensive legal interpretation by the Judicial Branch.[22] The

---

Puerto Rico, which thenceforth changed Puerto Rico's status from that of an unincorporated territory to the unique one of Commonwealth. Joint Resolution of July 3, 1952, ch. 567, 66 Stat. 327; *U.S. v. Quinones*, 758 F.2d 40, 42 (1st Cir.1985); *Cordova & Simonpietri*, 649 F.2d at 41. The change to Commonwealth carried with it "significant changes in Puerto Rico's governmental structure and its relationship with the United States." *See Calero–Toledo*, 416 U.S. at 672, 94 S.Ct. at 2086 ...

**21.** For a different view, *see* the Report of the "U.S.–Puerto Rico Commission on the Status of Puerto Rico", which was created by Congress on February 20, 1964 (P.L. 88–271, 78 Stat. 17), and which included members of Congress.

**22.** In a recent case, the Supreme Court reviewed the Judiciary's role in interpreting the Constitution. It essentially held that:

[o]ur national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury v. Madison*, 5 U.S (1 Cranch) at 177, 2 L.Ed. 60. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed. RFRA was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute here invoked are beyond congressional authority, it is this Court's precedent, not RFRA, which must control.

*City of Boerne v. Flores*, —— U.S. ——, ——, 117 S.Ct. 2157, 2171, 138 L.Ed.2d 624 (1997). *See also U.S. v. Klein*, 80 U.S. (13 Wall) 128, 20 L.Ed. 519 (1871); Laurence H. Tribe, *American Constitutional Law* 50 (Foundation Press 1988) ("[i]f Congress does not purport to alter the governing procedural and substantive law, Congress cannot force its interpretation of that law upon the federal courts in particular cases").

Judiciary's interpretation of the constitutional status of Puerto Rico is best exemplified by Judge Magruder's seminal opinion in *Figueroa v. People of Puerto Rico*, 232 F.2d 615 (1st Cir.1956), previously cited herein.

■ Forty years later, we agree with Judge Magruder: "We find no reason to impute to Congress the perpetration of such a monumental hoax." *Id.* at 620. We therefore hold that dual sovereignty exists in the Commonwealth of Puerto Rico, and that defendant's motion to dismiss must thus, be **DENIED.**[23]

**SO ORDERED.**

---

**23.** Because this Court has found the existence of dual sovereignty between the Commonwealth of Puerto Rico and the United States, defendant's additional argument regarding the application of the doctrine of collateral estoppel must also fail. The same logic and analysis espoused regarding the issue of dual sovereignty applies to the issue of collateral estoppel. In addition, because we have decided that Puerto Rico is a sovereign for purposes of the Double Jeopardy Clause, we need not address the Government's alternative arguments in opposition to defendant's motion.